# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Brown*, 2013 IL 114196

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TIFFANY BROWN, Appellant. |
| Docket No. | 114196 |
| Filed | December 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where there was no evidence of defendant's role in the creation of a counterfeit check on which she was payee, she did not become the maker of the instrument by endorsing it in her own name, and her conviction for forgery by making the check was reversed. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. William G. Lacy, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part.<br>Circuit court judgment affirmed in part and reversed in part. |

| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Benjamin A. Wolowski, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant. |

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz and Mary P. Needham, Assistant State's Attorneys, of counsel), for the People.

Justices     JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Karmeier, Burke, and Theis concurred in the judgment and opinion.

Justice Thomas specially concurred, with opinion, joined by Justice Kilbride.

## OPINION

¶ 1  Following a bench trial in the circuit court of Cook County, defendant, Tiffany Brown, was convicted of several offenses, including forgery by making a counterfeit check (720 ILCS 5/17-3(a)(1) (West 2006)), forgery by delivering the check (720 ILCS 5/17-3(a)(2) (West 2006)), and attempted theft by delivering the check (720 ILCS 5/8-4, 16-1(a)(1)(A) (West 2006)). The appellate court, *inter alia*, upheld defendant's convictions for forgery by making the check and for attempted theft, and vacated the conviction for forgery by delivery. 2011 IL App (1st) 101391-U.

¶ 2  This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). Defendant challenges only her conviction for forgery by making the check. We now affirm in part and reverse in part the judgment of the appellate court and the judgment of the circuit court.

¶ 3         I. BACKGROUND

¶ 4  In August 2006, defendant was approximately 35 years old and had been a Chicago police officer for nearly seven years.[1] Defendant's sister was Abeni Brown and defendant's mother was Zenobia Brown. Defendant maintained a checking account at the Chicago Patrolmen's Federal Credit Union (credit union).

---

[1]Defendant stated in the presentence investigation report that she was employed by the department from November 1999 to January 2009.

¶ 5    On August 31, 2006, defendant entered the credit union and, while talking on her cell phone, presented to a teller, Samara Galvan, a letter, a check, a deposit slip, and identification. The letter purportedly related to a lawsuit in "the court room of Judge G. Imgram," where the plaintiff was Abeni and the defendant was Six Flags Great America. The letter described an August 25, 2006, ruling in favor of Abeni in the amount of $3.5 million. The letter also designated as "beneficiaries" defendant, to receive $1 million; Zenobia, to receive $2 million; and defendant's cousin, Ahmad Murphy, to receive $500,000. Further, the letter contained the signatures of "the clerk of Judge G. Imgram," "Attorney at Law Susan T. Mitchell," "Attorney at Law Bennetta C. Thompson," and "CEO, Six Flags Great America[,] Dr. Bryan D. Douglas."

¶ 6    The check, dated August 25, 2006, was purportedly drawn on the JPMorgan Chase bank account of Six Flags Great America, made payable to defendant in the amount of $1 million. The drawer's signature was "Bryan Douglas." On the reverse side, defendant endorsed the check with her signature and credit union member number. The check raised several red flags for Galvan. Initially, three sets of numbers were printed at the bottom of the check instead of the usual two, and none were the customary nine-digit routing number. Also, the texture of the check and the print font were atypical. Further, $1 million would typically be deposited by wire transfer and not by check.

¶ 7    Galvan left the teller window to speak with her manager, Maria Villasenor. Galvan showed Villasenor the letter, check, and deposit slip. Villasenor glanced at the check but did not observe its amount. She instructed Galvan to accept the check. Galvan also photocopied the letter and the deposit slip and kept them with the check. She returned to the teller window, where defendant was still talking on her cell phone. Defendant asked Galvan what was wrong, and Galvan responded that "everything was okay." Defendant told Galvan that her lawyer was on the phone and would speak to Galvan if there were a problem. Galvan responded that she did not need to speak to defendant's lawyer.

¶ 8    The following day, September 1, 2006, a credit union employee informed Villasenor that the credit union scanner would not accept defendant's check because it could not read the routing number. Villasenor instructed the employee to verify the routing number. The employee returned with the check and told Villasenor that the routing number was missing a digit. Villasenor looked closely at the check and saw that it was written in the amount of $1 million. She had never before seen a check for $1 million. During her banking career, Villasenor had received training in identifying counterfeit checks. She suspected that the purported business check was counterfeit based on the arrangement of the routing numbers, the texture of the paper, and the check's "rainbow" or "cotton candy" color.

¶ 9    Suspecting that the check was counterfeit, Villasenor telephoned JPMorgan Chase Bank, which confirmed that the check was not drawn on that bank. Villasenor then placed a permanent hold on defendant's deposit. According to Villasenor, the check had to go through the banking system to be stamped "counterfeit." Pursuant to credit union procedure, Villasenor sent a letter to defendant informing her that there was a permanent hold on her deposit.

¶ 10   On September 7, 2006, defendant telephoned Villasenor to ask what the letter meant.

Villasenor told defendant that because the check was for such a large amount, a hold had been placed until the check cleared. Defendant told Villasenor that defendant won a lawsuit against Great America, and that someone from Great America was supposed to telephone the credit union to verify that the check was good. Defendant then told Villasenor that someone from Chase Bank was supposed to call the credit union. Defendant finally told Villasenor that she would instruct her lawyer to call Villasenor to inform her that the check was good. No one from Great America or Chase Bank, or any attorney, ever contacted Villasenor and told her that the check was good.

¶ 11    On September 11, 2006, the credit union's accounting department formally notified Villasenor that the check had been determined to be counterfeit. Villasenor called defendant on a speaker phone in the presence of the credit union's chief operating officer James Bedinger. Villasenor informed defendant that Chase Bank returned the check, and that the $1 million would be debited from her account. Defendant responded that Great America had filed for bankruptcy. Villasenor asked when did defendant learn that, to which defendant answered "this morning." Villasenor told defendant that Villasenor would have to debit the $1 million, to which defendant responded, "Well I'm going to have to sue Great America again then."

¶ 12    Chicago police detective Francisco Roman was assigned to investigate this case. He learned that: there was never a lawsuit filed or settled between Abeni and Great America; there was no one named Bryan Douglas at Great America; there were no licensed Illinois attorneys named Susan T. Mitchell or Bennetta C. Thompson; and Great America never issued any check to defendant or any member of her family. On September 27, 2006, Detective Roman arrested defendant for attempted theft and forgery by delivery. After her arrest, Detective Roman permitted defendant to use the telephone. Defendant indicated that she was going to call several persons including Zenobia and an attorney named Bennetta Thompson.

¶ 13    In November 2006, the original arrest charges were superceded by a seven-count indictment. Defendant was again charged with attempted theft by delivering the counterfeit check (count III) and forgery by delivering the check (count II), but also with forgery by making the check (count I). Defendant was additionally charged with three counts of official misconduct (720 ILCS 5/33-3(b) (West 2006)) predicated on the attempted theft and forgery charges (counts IV, V, and VI), and one count of official misconduct in that, by making the check, she violated a Chicago police department rule prohibiting conduct that brings discredit upon the department (count VII).

¶ 14    In October 2009, defendant waived a jury, and the court conducted a bench trial on all counts. The State's evidence adduced the above-recited facts. Detective Roman further testified that, in the course of his investigation, he discovered two police reports, dated early August 2006, identifying Abeni as an offender and defendant as the victim. Also, on cross-examination, Detective Roman testified that he was unable to find any evidence that defendant actually created the settlement letter or affixed any signatures thereto. Roman was likewise unable to find any evidence that defendant actually created the check or affixed thereto the signature of "Bryan Douglas" as the purported drawer.

¶ 15    Additionally, the parties stipulated that if Cynthia Reising were called as a witness, she would testify as follows. Reising is the comptroller of Six Flags Great America. Great America did not issue the purported check. The drawer address on the check was incorrect; the check was not drawn on a bank that Great America used; the check contained numbers that did not match any Great America account; any payment from Great America requires two signatures on a check; and Bryan Douglas was neither an authorized signatory nor even an employee of Great America. Further, employment records indicate that Abeni was employed at Great America from May 8, 2004, until June 11, 2004, when her employment was terminated for tardiness and unsatisfactory work.

¶ 16    The trial court admitted the State's exhibits without objection, and the State rested. Defendant moved for a directed finding of not guilty. Defendant argued that the State failed to present in its case in chief any evidence that she: (1) created the check, or (2) delivered the check to the credit union knowing that the check was counterfeit. The trial court denied defendant's motion as to all counts.

¶ 17    Defendant testified as follows. In addition to being a college graduate and a single mother of one son, she was raising her two nephews from her sister Abeni. She was raising Abeni's children because "more often than not" Abeni had not been in their lives due to her repeated legal problems. In 2005, Abeni was convicted and sentenced for forging defendant's name on a check for $80 and cashing it. She was released in 2006. Abeni was arrested again for buying an automobile and renting a condominium in defendant's name. Next, in early August 2006, Abeni went to the credit union wearing a wig to impersonate defendant, forged defendant's name, and withdrew $700 from an account jointly held by Abeni, Zenobia, and defendant. Abeni's name was thereafter removed from the account.

¶ 18    In late 2006, Zenobia told defendant that Abeni had settled a lawsuit against Great America, where defendant knew that Abeni had worked. Zenobia also told defendant that Abeni was dying, and that Abeni was distributing the settlement proceeds between Zenobia, defendant, Abeni's children, and defendant's cousin, Ahmad Murphy. Zenobia gave defendant the $1 million check payable to defendant and the settlement letter. Defendant testified that she was "in shock *** [b]ecause for the first time in Abeni's life she was going to do right by her children and right by my mother and myself." Defendant did not independently confirm any of this information; she accepted it at face value from her mother.

¶ 19    On August 31, 2006, with the settlement letter in hand, defendant went to the credit union to deposit the check in her checking account. Defendant believed that the letter was genuine. She denied creating the letter or affixing any signatures to it. Defendant likewise believed that the check was genuine. She did endorse the check. However, defendant denied that she created, or played any part in creating, the check. Defendant acknowledged that she was talking on her cell phone while depositing the check. Defendant testified that she was speaking to the purported attorney "Bennetta C. Thompson." Prior to the deposit, defendant and Zenobia had spoken with "Thompson" and "Susan T. Mitchell." By the time of her trial, defendant had learned that "Thompson" was not a licensed Illinois attorney, but was working with Abeni.

¶ 20    After receiving the credit union notice that a hold was placed on her deposit, she

acknowledged that she telephoned Villasenor to ask what the letter meant. However, defendant denied telling Villasenor that *defendant* had a lawsuit against Great America. Rather, defendant told Villasenor that Abeni was the plaintiff in that case. During this conversation, defendant relayed information from one of Abeni's purported attorneys to Villasenor. During the September 11, 2006, phone call between defendant and Villasenor, defendant told Villasenor that Great America had filed for bankruptcy because defendant had received that information from "Thompson."

¶ 21     Defendant thereafter left several messages for "Thompson," which were never returned. Also, defendant unsuccessfully tried to locate Abeni. After defendant's arrest, she learned that the check was counterfeit, Abeni was not sick, and that "this was just another of her [Abeni's] schemes." Defendant had not had any contact with Abeni subsequent to defendant's arrest.

¶ 22     Ahmad Murphy testified as follows. Zenobia is his paternal aunt, and Abeni and defendant are his cousins. Murphy grew up in Chicago and South Carolina, and eventually attended high school in South Carolina. He attended college and found employment in North Carolina. As a child, when Murphy was in Chicago, he lived with defendant, whom he described as "[s]ort of a surrogate mother," who "helped raise" him.

¶ 23     In April 2006, Murphy was attending college when Zenobia telephoned to inform him that Abeni was sick and had given him money from the settlement of a lawsuit. Murphy flew to Chicago and stayed with defendant. Murphy met with Zenobia, who gave Murphy a check for $500,000 payable to him. Murphy was "shocked" and "surprised" because "Abeni has caused a lot of grief with our family."

¶ 24     The check that Zenobia gave to Murphy looked like the check that she gave to defendant, except that Murphy's check was payable to him in the amount of $500,000. Murphy did not attempt to verify that the check was genuine because he did not believe that the check was counterfeit. He never spoke to Abeni about the check because he did not know where Abeni was when he received the check. Murphy endorsed the check and deposited it into his account with Bank of America in Chicago. In September 2006, Murphy learned from defendant or Zenobia that the check was counterfeit, and that Abeni was not sick or dying. No one, including his bank, has contacted Murphy regarding the counterfeit check he deposited.

¶ 25     In January 2010, following the close of evidence and argument, the trial court found defendant guilty as charged on all counts. Defendant timely filed a posttrial motion for judgment of acquittal, or alternatively, a new trial. At the May 2010 hearing on the motion, defendant argued that the State failed to prove her guilty of the charged offenses beyond a reasonable doubt. The State confessed error as to count VII, the charge of official misconduct based on violating a Chicago police department rule prohibiting conduct that brings disrepute upon the department.[2] The trial court granted defendant's motion for acquittal on count VII, but denied her motion as to the remaining charges. The court sentenced defendant to two

---

[2]See *People v. Williams*, 393 Ill. App. 3d 77, 82-84 (2009) (police department rules and regulations not predicate "laws" under official misconduct statute), *aff'd*, 239 Ill. 2d 119 (2010).

years' probation and 50 hours of community service on counts I through VI.

¶ 26 On appeal, the appellate court found no evidence in the record that defendant was acting in her official capacity as a police officer when she deposited the check. Accordingly, the court reversed defendant's three remaining official misconduct convictions as charged in counts IV, V, and VI. 2011 IL App (1st) 101391-U, ¶¶ 25-29. Also, the appellate court found that the conviction for forgery by delivering the check as charged in count II, and the conviction for attempted theft by delivering the check as charged in count III, violated the one-act, one-crime doctrine. The court further observed that the Class 2 offense of attempted theft was a more serious offense than the Class 3 offense of forgery. Accordingly, the court vacated defendant's conviction of forgery by delivery as charged in count II. *Id.* ¶ 32. However, the appellate court held that defendant's endorsement on the back of the check constituted "making" the check. Accordingly, the court upheld defendant's conviction for forgery by making the check as charged in count I. *Id.* ¶¶ 18-24.[3]

¶ 27 Defendant appeals to this court. Additional pertinent background will be discussed in the context of our analysis of the issues.

¶ 28                                                   II. ANALYSIS

¶ 29 Before this court, defendant does not challenge her conviction of attempted theft by delivering the counterfeit check. Rather, defendant's sole contention is that the evidence fails to establish that she committed the offense of forgery by making the check (720 ILCS 5/17-3(a)(1) (West 2006)).

¶ 30                                                   A. Mootness

¶ 31 The State initially responds that this contention is moot. The State observes as follows. Defendant was convicted not only of forgery by making the check, but was also convicted of forgery and attempted theft by delivering the check (720 ILCS 5/8-4, 16-1(a)(1)(A), 17-3(a)(2) (West 2006)), which she does not contest. Attempted theft is the greatest offense of which defendant was convicted, and she received a single sentence of probation. Therefore, according to the State, "it is of no consequence whether defendant is also guilty of forgery on another basis."

¶ 32 We disagree with the State that this issue is moot. The record shows that defendant was convicted of counts I through VI, and defendant's sentencing order expressly states that she received a single sentence on those counts. Also, the sentencing order cites specifically to both the "making" and "delivery" provisions of the forgery statute (720 ILCS 5/17-3(a)(1), (a)(2) (West 2006)). Thus, defendant's record clearly indicates that she was convicted of forgery by making the check. This alleged surplus conviction not only may prejudice defendant in the future (see *People v. Davis*, 156 Ill. 2d 149, 160 (1993); *People v. Lilly*, 56

---

[3]The appellate court further reasoned that defendant's conviction for forgery by making the check and her conviction for attempted theft by delivering the check did not violate the one-act, one-crime doctrine because they were based on different acts. *Id.* ¶ 33.

Ill. 2d 493, 495 (1974)), but also affects the integrity of the judicial process (*People v. Artis*, 232 Ill. 2d 156, 165-68 (2009); *People v. Harvey*, 211 Ill. 2d 368, 389 (2004)).

¶ 33 Additionally, we observe that defendant was sentenced in May 2010. Therefore, she could already have served her sentence of two years' probation and 50 hours of community service. However, the nullification of a conviction unquestionably may have important consequences to a defendant, whether or not the attendant sentence has been served. "In such circumstances, 'the probability that a criminal defendant may suffer collateral legal consequences from a sentence already served precludes a finding of mootness.' " *People v. Jordan*, 218 Ill. 2d 255, 263 (2006) (quoting *People v. Jones*, 215 Ill. 2d 261, 267 (2005)).

¶ 34                                                    B. Endorsement

¶ 35 Turning to the merits, defendant contends that the record does not contain any evidence that she created the bogus check. According to defendant her conviction for forgery by making the check was based solely on the fact that she endorsed the check in her own name. However, prior to considering the sufficiency of the evidence, we must first determine whether defendant's endorsement of the check constituted "making" the check within the meaning of the forgery statute. This is a matter of statutory construction, which is a question of law reviewed *de novo*. *People v. Howard*, 228 Ill. 2d 428, 432 (2008); *People v. Harris*, 203 Ill. 2d 111, 116 (2003).

¶ 36 The principles guiding our review are familiar. The primary objective in construing a statute is to ascertain and give effect to the intent of the legislature. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. A court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous. The court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. Also, a court presumes that the General Assembly, in its enactment of legislation, did not intend absurdity, inconvenience, or injustice. *People v. Gutman*, 2011 IL 110338, ¶ 12; *People v. Zimmerman*, 239 Ill. 2d 491, 497 (2010).

¶ 37 This court has explained that, prior to the Criminal Code of 1961, several separate statutes prohibited the forgery of specific types of documents and prescribed different penalties depending on the instrument involved. Section 17-3 of the Criminal Code of 1961 incorporates and codifies all forms of forgery into a single criminal statute. *People ex rel. Miller v. Pate*, 42 Ill. 2d 283, 285-86 (1969); see *People v. Lanners*, 122 Ill. App. 2d 290, 293 (1970). At the time of defendant's offenses, section 17-3 defined forgery in pertinent part as follows:

> "(a) A person commits forgery when, with intent to defraud, he knowingly:
>
> (1) makes or alters any document apparently capable of defrauding another in such manner that it purports to have been made by another or at another time, or with different provisions, or by authority of one who did not give such authority; *or*

(2) issues or delivers such document knowing it to have been thus made or altered; *or*

(3) possesses, with intent to issue or deliver, any such document knowing it to have been thus made or altered[.]" (Emphases added.) 720 ILCS 5/17-3(a) (West 2006).[4]

¶ 38    The gist of forgery is the intent to defraud. *People v. Henderson*, 71 Ill. 2d 53, 57 (1978); *People v. Crouch*, 29 Ill. 2d 485, 488 (1963). The State must establish that a defendant had the intent to defraud by making or altering, possessing with intent to deliver, or issuing or delivering any document apparently capable of defrauding another. 720 ILCS 5/17-3(a)(1) to (a)(3) (West 2006); see *People v. Horrell*, 381 Ill. App. 3d 571, 574 (2008); *People v. Stout*, 108 Ill. App. 3d 96, 101 (1982). By use of the disjunctive "or," the forgery statute recognizes that these acts can be committed separately, and ensures that a defendant is properly charged based on the stage of the process the defendant occupies. See *People v. Angarola*, 387 Ill. App. 3d 732, 740 (2009).

¶ 39    Specifically regarding subsection (a)(1) of the forgery statute, the State must prove beyond a reasonable doubt that a defendant, with the intent to defraud, knowingly made or altered a document such that it is capable of defrauding another. 720 ILCS 5/17-3(a)(1) (West 2006); see *Angarola*, 387 Ill. App. 3d at 737; *People v. D'Andrea*, 361 Ill. 526, 532 (1935) (applying predecessor forgery statute). The document "need not necessarily be in due legal form" (*id.* at 533), or be so skillfully prepared that it requires an expert to detect it. *Goodman v. People*, 228 Ill. 154, 158 (1907). Rather, the test of whether a forged document is apparently capable of defrauding another is whether a reasonable person might be deceived into accepting the document as genuine. *Id.*; see *People v. Turner*, 179 Ill. App. 3d 510, 518 (1989); *People v. Tarkowski*, 106 Ill. App. 3d 597, 601 (1982).

¶ 40    In the case at bar, defendant has steadfastly contended throughout these proceedings that the evidence fails to establish that she created the bogus check in violation of subsection (a)(1). The appellate court rejected this contention. After citing *People v. Epping*, 17 Ill. 2d 557 (1959), and *People v. Connell*, 91 Ill. App. 3d 326 (1980), the court observed the uncontested fact that defendant endorsed the check. The court concluded: "Thus, viewing the evidence in the light most favorable to the State, we find that defendant, by endorsing the check, made the document apparently capable of defrauding another, such that a reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 2011 IL App (1st) 101391-U, ¶ 23. Defendant assigns error to this reasoning.

¶ 41    The appellate court failed to recognize defendant's position in the forgery statute's sequence of culpable events. For example, the appellate court overlooked this court's decision in *People v. Christison*, 396 Ill. 549 (1947), where the defendant contended that he

[4]The forgery statute defines the requisite intent to defraud as "an intention to cause another to assume, create, transfer, alter or terminate any right, obligation or power with reference to any person or property," and defines "document" as including, but not limited to, "any document, representation, or image produced manually, electronically, or by computer." 720 ILCS 5/17-3(b) (West 2006).

was not properly charged with forgery because, *inter alia*, "the check *was not endorsed* and never cashed." (Emphasis added.) *Id.* at 550. This court rejected the defendant's contention, reasoning that the crime of forgery is "complete" with the making of the false document with the intent to defraud, and that it is immaterial whether anyone was in fact defrauded. *Id.* at 551 (and cases cited therein). *Christison* teaches that forgery by making a counterfeit check occurs at the check's creation with the requisite intent to defraud. A counterfeit check is capable of defrauding without the need to be endorsed. See, *e.g.*, *People v. Bokuniewicz*, 160 Ill. App. 3d 270, 274 (1987).

¶ 42    Further, the appellate court misapprehended this court's decision in *People v. Epping*, 17 Ill. 2d 557 (1959). That case involved an instrument that was otherwise valid, but was made the subject of forgery by the defendant's false endorsement. This court explained that the inquiry is "whether the endorsement renders the instrument capable of defrauding and is made for that purpose. If so, the other elements being present, it is forgery." *Id.* at 569. This court concluded that the defendant's forged endorsement rendered the "seemingly valid" instrument capable of defrauding. *Id.* Similarly, the defendant in *People v. Connell*, 91 Ill. App. 3d 326 (1980), contended that he did not "make" a check within the meaning of subsection (a)(1) of the forgery statute. Rather, according to the defendant, he merely found a valid check payable to another and endorsed the check with the forged name of the payee. The appellate court correctly concluded that proof of the defendant's forged endorsement "was as a matter of law sufficient proof of a 'making' of the check." *Id.* at 334.[5] *Epping* teaches that a false endorsement can render an otherwise valid check capable of defrauding.

¶ 43    Considered together, *Christison* and *Epping* teach that where a check itself is counterfeit, forgery by making occurs, or is complete, when the check is first created with the intent to defraud. However, where a check is valid, there is no forgery by making until someone affixes an endorsement that renders the otherwise valid check capable of defrauding.

¶ 44    In the case at bar, the offense of forgery by making was complete when the counterfeit check was created. The check was capable of defrauding without defendant's endorsement. Therefore, defendant's endorsement of the check, by itself, did not render the check capable of defrauding. Consequently, her endorsement did not constitute "making" the check within the meaning of subsection (a)(1) of the forgery statute.

¶ 45    We observe that the appellate court rejected defendant's contention that her endorsement of the bogus check *in her own name* was not capable of defrauding. 2011 IL App (1st) 101391-U, ¶ 24. Before this court, the parties disagree as to whether a defendant's endorsement in his or her own name can render a check capable of defrauding. However, we deem discussion of this issue unnecessary because the counterfeit check in the case at bar was capable of defrauding at its creation without any endorsement, be it forged or genuine. See *People v. Campa*, 217 Ill. 2d 243, 269-70 (2005) (reviewing court will not decide

---

[5]The appellate court reasoned: "Without endorsement, the check could not be cashed." *Connell*, 91 Ill. App. 3d at 334. In the context of that case, the court was simply explaining that absent the defendant's forged endorsement, that otherwise valid check was not capable of defrauding.

nonessential issues or render advisory opinions).

¶ 46                     C. Sufficiency of the Evidence

¶ 47    In her appellant's brief before this court, defendant argues that, beyond the issue of her endorsement, "there was no evidence presented at trial" that she actually created the check. The State counters that "ample circumstantial evidence established that defendant created the fraudulent check, and the trial court never stated that it found defendant guilty of [making the check] based solely on her endorsement."

¶ 48    The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979); *In re Winship*, 397 U.S. 358, 361-64 (1970); *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. *Jackson*, 443 U.S. at 318-19; *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000). This standard of review "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; accord *People v. Howery*, 178 Ill. 2d 1, 38 (1997). Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Cooper*, 194 Ill. 2d at 431. Although these determinations by the trier of fact are entitled to deference, they are not conclusive. Rather, a criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007); *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). This same standard of review applies regardless of whether the defendant receives a bench or jury trial. *Cooper*, 194 Ill. 2d at 431.

¶ 49    This court has recognized that a criminal conviction may be based solely on circumstantial evidence. *Wheeler*, 226 Ill. 2d at 120; *People v. Hall*, 194 Ill. 2d 305, 330 (2000). However, the same standard of review applies whether the evidence is direct or circumstantial. *Wheeler*, 226 Ill. 2d at 116-18; *Cooper*, 194 Ill. 2d at 431. The State argues: "Based on all of the evidence it was more than reasonable for the trial court to deduce that defendant made or altered the check." We disagree.

¶ 50    We have detailed the evidence adduced at trial. The trial court concluded that the testimony of defendant and her cousin Ahmad was incredible and unworthy of belief. The court found that defendant was an educated police officer with a sister who had a criminal record of similar crimes. Under these circumstances, the trial court rhetorically asked why defendant did not attempt to determine the legitimacy of the check by: arranging a meeting with the purported attorneys, or consulting with another attorney; or showing the check to the credit union prior to deposit. Because defendant did not do any of these things, the trial court reasoned: "Quite frankly, my mother gave me the check excuse just doesn't hold

-11-

water." The court found defendant guilty on all counts, including forgery by making the check.

¶ 51    Our analysis of this issue "does not necessitate a point-by-point discussion of every piece of evidence as well as every possible inference that could be drawn therefrom." *Wheeler*, 226 Ill. 2d at 117. The totality of the evidence pertains to the *delivery* of the check, as prohibited by subsection (a)(2) of the forgery statute. Indeed, defendant does not contest that she delivered the check, which supported her attempted theft conviction. However, wholly absent from this record is any evidence that defendant *made* the check as prohibited by subsection (a)(1). Indeed, Detective Roman, the investigating officer, testified that he did not find any evidence that defendant created the settlement letter or the check. Proof of forgery by making "must be connected with the person charged or there is a failure of proof."*People v. Ciralsky*, 360 Ill. 554, 560 (1935).

¶ 52    Of course, the State bears the burden of proving beyond a reasonable doubt each element of a charged offense and the defendant's guilt. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994); *Howery*, 178 Ill. 2d at 32; *People v. Tye*, 141 Ill. 2d 1, 15 (1990). In the case at bar, there was an entire failure of proof upon the essential element that defendant created the check. Defendant's conviction of forgery by making (720 ILCS 5/17-3(a)(1) (West 2006)) must be reversed.

¶ 53    When a reviewing court reverses a conviction based on evidentiary insufficiency, the constitutional prohibition against double jeopardy (U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 10) precludes the State from retrying the defendant. Therefore, "the only proper remedy is a judgment of acquittal." *Williams*, 239 Ill. 2d at 133; accord *Tibbs v. Florida*, 457 U.S. 31, 40-42 (1982); *Burks v. United States*, 437 U.S. 1, 11-18 (1978); *People v. Mink*, 141 Ill. 2d 163, 173-74 (1990).

¶ 54    In sum, defendant's sentencing order reflects that she was convicted as charged in counts I through VI. We reverse defendant's conviction of forgery by making the check as charged in count I, as well as that part of the appellate court judgment that upheld the conviction. As earlier noted, the appellate court vacated the conviction of forgery by delivery in count II under one-act, one-crime principles, and the official misconduct convictions as charged in counts IV, V, and VI. Accordingly, we modify defendant's sentencing order here, to reflect her sole remaining conviction of attempted theft as charged in count III.

¶ 55                                   III. CONCLUSION

¶ 56    For the foregoing reasons, the judgment of the appellate court is affirmed in part and reversed in part, and the judgment of the circuit court of Cook County is affirmed in part and reversed in part.

¶ 57    Appellate court judgment affirmed in part and reversed in part.

¶ 58    Circuit court judgment affirmed in part and reversed in part.

¶ 59    JUSTICE THOMAS, specially concurring:

¶ 60    I agree with the conclusions of the majority in the first two sections of its analysis and its reasons for reaching those conclusions. The question of whether the evidence was sufficient to establish that defendant committed the offense of forgery by making the check under count I was not moot, and a conviction for that offense cannot rest solely on the fact that a defendant endorses a forged check.

¶ 61    I also agree with the majority's ultimate conclusion rejecting the State's argument that the circumstantial evidence presented in this case was sufficient to prove beyond a reasonable doubt that defendant created the fraudulent check. I write separately, however, because I would reach this conclusion based on somewhat different reasoning than that employed by the majority.

¶ 62    Section 17-3(a)(1) and (2) of the forgery statute provides in relevant part that "(a) A person commits forgery when, with intent to defraud, he knowingly: (1) makes or alters any document apparently capable of defrauding another ***; or (2) issues or delivers such document knowing it to have been thus made or altered." 720 ILCS 5/17-3(a)(1), (2) (West 2006). Following a bench trial, defendant was convicted of, among other offenses, forgery by making the check under section 17-3(a)(1) (count I), forgery by delivery of the check under section 17-3(a)(2) (count II), and attempted theft by delivering the check (count III). The appellate court subsequently vacated count II under one-act, one-crime principles, as it was based on the same act of delivery as the greater offense of attempted theft under count III. 2011 IL App (1st) 101391-U, ¶ 32. The appellate court affirmed defendant's convictions under counts I and III. *Id*. ¶ 41.

¶ 63    The relevant facts in the record and the reasonable inferences from those facts indicate the following. Defendant presented a forged check to the Chicago Patrolman's Federal Credit Union (credit union) in the amount of $1 million for deposit on August 31, 2006. Defendant gave the teller on duty, Samara Galvan, the check, which defendant had endorsed. Defendant also presented a deposit slip, two forms of identification, and an affidavit claiming that the check was from the settlement of a lawsuit against Six Flags Great America (Great America).

¶ 64    Galvan knew defendant from her prior contact with her over an incident that occurred a few weeks earlier at the credit union in early August of 2006. Galvan recalled that with respect to that incident, defendant had claimed that a fraud had been committed on her account by someone who had improperly withdrawn money from it. It turned out that the money was withdrawn by defendant's sister, Abeni Brown, who was "posing" as defendant. Galvan was also the teller for that transaction. She noted that the person posing as defendant wore a wig and glasses. Galvan further noted that Abeni had joint ownership of the account. It was never explained at trial why Abeni would have had to pose as defendant, given that Abeni had the right to access the account and take money out in her own name. At any rate, Galvan opened up a new account for defendant and resolved that she would recognize defendant in the future.

¶ 65    Galvan was immediately suspicious of the $1 million check when defendant presented it on August 31. Galvan showed the check to her supervisor, Maria Villasenor. Villasenor briefly glanced at the check, but did not notice the amount. She directed Galvan to process

the check, but to put a hold on it. After making a copy of the affidavit given to her by defendant, Galvan walked back to the teller window to where defendant was still standing. Defendant was now on her cell phone. Defendant asked if anything was wrong, and Galvan told here that "everything was okay." Defendant then pretended that she had her lawyer on the phone. Defendant told Galvan that Galvan could speak to the lawyer on the phone "if there were any problems."

¶ 66 The next morning, on September 1, 2006, it was brought to Villasenor's attention that the credit union's scanner could not read the check because it was missing one of the nine digits required for a valid routing number. At that time, Villasenor noticed for the first time that the check amount was for $1 million. She could tell from the lines, color and texture, and the lack of a full routing number that it was not a good check and that there was a chance it was counterfeit. Villasenor then called Chase Bank and verified over the phone that the check was forged. She then placed a permanent hold on defendant's account and sent mail notice to defendant informing her of the hold. Villasenor explained at trial that if she had not placed a hold on the account, defendant would have been able to get $5,000 from the account after two business days as a result of the available balance that would have resulted from the deposit of the check.

¶ 67 On September 7, 2006, defendant called Villasenor to ask what the letter meant. During the course of that conversation, defendant told Villasenor a series of lies. Defendant said she had sued Great America and had won the lawsuit, that someone from Great America was supposed to call the credit union to let it know this was a good check, that Chase Bank would call the credit union, and finally that defendant would have her lawyer call to let the credit union know that it was a good check.

¶ 68 Villasenor talked to defendant again on the phone on September 11, 2006, after the credit union's accounting department notified Villasenor that the check was indeed counterfeit. Villasenor informed defendant that Chase Bank had not honored the check and that the credit union would have to debit defendant's account. Defendant responded to this news with more lies. She said that she was "going to have to sue Great America again then." She also claimed that the check was dishonored because Great America had just filed for bankruptcy. When Villasenor asked defendant when she had learned this, defendant said that she had found this out that morning.

¶ 69 Chicago Police Detective Francisco Roman conducted the investigation of the forged check. Roman contacted the chief financial officer of Great America, who confirmed that there were never any checks issued to defendant or any of her family members by the company. Moreover, Great America was never sued by defendant or any of her family members. Detective Roman did confirm, however, that Abeni Brown is an actual person and is the sister of defendant. Roman found that Abeni had two case reports in the police department database. Both incidents involved Abeni committing identity theft against defendant. Roman testified at trial that he had not gathered any evidence to indicate that defendant actually created either the forged check or the affidavit claiming that the check was the result of a lawsuit against Great America. Detective Roman admitted that he did not contact Abeni in connection with this case. He noted that there was an investigative alert out for her, but no one from the police department had spoken to her.

¶ 70    The majority concludes that based on the evidence there was an "entire failure of proof upon the essential element that defendant created the check." *Supra* ¶ 52. The majority claims that the totality of the evidence pertains to the *delivery* of the check, and it finds it significant that Detective Roman, as the investigating officer, did not gather any direct evidence that defendant created the settlement check or affidavit. *Supra* ¶ 51. The majority finds that its "analysis of this issue 'does not necessitate a point-by-point discussion of every piece of evidence as well as every possible inference that could be drawn therefrom.' " *Supra* ¶ 51 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007)).

¶ 71    The majority's quote from *Wheeler* needs to be placed in the proper context. In that case, this court agreed with the defendant's contention that the requirement that "*all of the evidence* is to be considered in the light most favorable to the prosecution" means that appellate review must include consideration of all of the evidence, not just the evidence convenient to the State's theory of the case. (Emphasis in original.) *Wheeler*, 226 Ill. 2d at 117. *Wheeler* continued on to clarify as follows:

> "However, the mandate to consider all the evidence on review does not necessitate a point-by-point discussion of every piece of evidence as well as every possible inference that could be drawn therefrom. To engage in such an activity would effectively amount to a retrial on appeal, an improper task expressly inconsistent with past precedent. [Citation.] Indeed, this court has stated that even 'the trier of fact is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.' [Citation.] We have also stated that '[t]he trier of fact need not *** be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. [Citation.] Accordingly, this court is not required to search out all possible explanations consistent with innocence or be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. On the contrary, we must ask, after considering all of the evidence in the light most favorable to the prosecution, whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Wheeler*, 226 Ill. 2d at 117-18.

¶ 72    Thus, our standard of review requires that we consider all of the evidence in the light most favorable to the prosecution and determine whether that evidence could reasonably support a finding of guilt beyond a reasonable doubt. I would also note that "[i]n forgery cases, proof must often be by circumstantial evidence." *People v. Baylor*, 25 Ill. App. 3d 1070, 1074 (1975) (citing *People v. Church*, 366 Ill. 149, 158 (1937)). This is because forgery is not a crime that is committed openly and notoriously. See *People v. Einstein*, 106 Ill. App. 3d 526, 532 (1982). It is by nature secretive, and it is therefore necessary that certain elements be proved from logical deductions from the facts and evidence. *Id.* Moreover, it is well established that the intent to defraud may be inferred from the facts and circumstances surrounding the transaction. *People v. Bailey*, 15 Ill. 2d 18, 23-24 (1958); *People v. Kunce*, 196 Ill. App. 3d 388, 391 (1990).

¶ 73    In the present case, there is no question that the circumstantial evidence was sufficient to show that defendant had an intent to defraud in connection with the forged check. Defendant does not contest the trial court's findings of guilt under counts II and III (forgery

-15-

by delivering the check and attempted theft by delivering the check), which necessarily established that she knew the check she deposited was not made by the authority of Bryan Douglas. Moreover, she told a series of lies in connection with the forged check to various credit union employees and pretended to talk with an attorney on the phone that could clear up any problems with the check. It was for the trial judge as the trier of fact in this case to determine the credibility of the witnesses and draw reasonable inferences from the facts. The trial judge reasonably determined that defendant's statements were of a person trying to hide her guilt of the forgery and that defendant's witnesses were not credible.

¶ 74     Having said that, however, I conclude that the evidence was not sufficient to prove defendant guilty of forgery under count I (the making of the check) when looking at all of the facts and circumstances of this case. My conclusion would likely have been different had this been a simple case of defendant claiming to have won a lawsuit on her own behalf and presenting a settlement check payable to herself. In such a case it may have been quite reasonable for the trier of fact to conclude that the circumstances were sufficient to show that defendant must have made the check. I do not believe it would have been necessary in such a case for the State to prove the making of the check, as defendant suggests, by introducing more concrete evidence, such as a digital image of the check on defendant's computer or evidence that defendant had made other copies at home. I would also not find it conclusive that the detective assigned to the case could find no such evidence, especially where there is no indication that a search of defendant's home was ever conducted.

¶ 75     Here, the problem with the State's case, then, is that other undisputed evidence negated the otherwise circumstantial evidence that might have indicated that defendant must have made the check. It was undisputed that the affidavit presented to the credit union by defendant in connection with the check indicated that it was for a purported lawsuit that claimed that defendant's sister, Abeni, was the plaintiff. It was uncontested that Abeni was an actual person, was defendant's sister, and had a history of fraud and identity theft. It was also uncontested that police did not question Abeni or otherwise investigate her possible role in the incident. Moreover, defendant was not charged with forgery in the making of the check based on an accountability theory. *Cf. Kunce*, 196 Ill. App. 3d at 391 (forgery may be charged on an accountability theory, which may be proved by circumstantial evidence). Under these circumstances, a reasonable doubt remains as to who actually created the $1 million forged check that defendant ultimately delivered with the intent to defraud.

¶ 76     Accordingly, I agree with the majority's decision to reverse defendant's conviction as charged in count I for the making of the check and to modify the sentencing order to simply reflect a conviction for attempted theft as charged in count III.


¶ 77     JUSTICE KILBRIDE joins in this special concurrence.