2020 IL App (1st) 173123-U

No. 1-17-3123

Order filed November 10, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 10312 |
| | ) | |
| ORLANDO DOMINGUEZ, | ) | The Honorable |
| | ) | William H. Hooks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for first degree murder over his contention that the evidence at trial contained too many "inconsistencies" and was contrary to human experience. Defendant was not denied effective assistance when trial counsel successfully objected to the substantive admission of portions of a witness's prior statements.

¶ 2    Following a bench trial, defendant Orlando Dominguez was found guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2014)) and sentenced to 40 years in prison. On appeal,

defendant contends that he was not proven guilty beyond a reasonable doubt when the evidence at trial contained too many "inconsistencies" and was contrary to human experience. He further contends that he was denied effective assistance when trial counsel failed to object to the admission of a witness's prior statements. We affirm.

¶ 3    Defendant was charged with six counts of first degree murder following the shooting death of Nicholas Ramirez on April 19, 2014. Defendant was 17 years old at the time of the shooting, which followed a chase and collision between a black Ford Explorer and a Nissan. Ramirez drove the Explorer, carrying passengers Michael Gonzalez, Emmanuel Estrada, Ivan Gonzalez, and Miguel Gonzalez.[1] Defendant drove the Nissan, carrying passengers Sarah Caproni, Anthony "Bolo" Vazquez, Joshua "Ali" Rivera, Justin "GK" Ventura, and Sheena Rodriguez.[2]

¶ 4    Michael testified that on the afternoon of April 18, 2014, Ramirez and Estrada came to his home. They then left in Ramirez's Explorer and picked up Ivan and Miguel. The group drank alcohol at Montrose Beach, then continued driving.

¶ 5    As Ramirez turned left onto Damen Avenue from Division Street, Michael saw defendant driving a vehicle. Defendant opened the vehicle's door, "trying" to exit. When Michael next noticed the vehicle, it had made a U-turn and was chasing the Explorer. The vehicle then hit the rear of the Explorer more than 20 times. At one point, Michael handed Ivan full cans of beer to throw at the other vehicle. Eventually, there was a collision and the Explorer stopped at Ashland Avenue and Hubbard Avenue. Ivan said that people were exiting the other vehicle, so Michael and

---

[1]Michael is not related to Ivan and Miguel. For clarity, this order will refer these individuals by their given names.

[2]The identities of Rivera, Ventura, and Rodriguez are derived from the testimony of three witnesses for the State, Caproni, Vazquez, and Detective Dale Potter, and are not at issue on appeal. Ventura's first name also appears as Justine, but the record establishes that Ventura was a man.

the others exited the Explorer. Michael was behind Ivan and Estrada as they ran away. He heard four gunshots. Michael later spoke to police, viewed a photographic array, and identified defendant as the driver of the vehicle that chased them.

¶ 6     During cross-examination, Michael acknowledged that he drank beer and used cocaine that evening. He threw one beer can during the chase and passed 20 cans to Ivan, "who was hanging out of the sunroof." Michael made a videotaped statement, but never reviewed the videotape.[3] In the statement, he did not describe defendant's clothing because he was only asked to describe what he remembered. He did not mention that beer cans were thrown out of the Explorer or the drugs because he was not asked. Upon questioning by the court, Michael testified that he did not see who shot Ramirez, five people were in the Explorer, and everyone drank beer.

¶ 7     Vazquez, who was in custody at the time of trial because he had not come to court for this case, testified that on April 18, 2014, he called defendant to ask for a ride so he could get marijuana. Defendant and Caproni picked up Vazquez and a woman, later identified as Rodriguez, in a Nissan. It was a "nippy" evening and defendant was wearing a dark "greyish" sweatshirt. Vazquez wore a light gray sweatshirt. The group then picked up Ventura and Rivera. At one point, Vazquez saw defendant put a firearm under the Nissan's hood.

¶ 8     Defendant drove the group to get marijuana and to Montrose Beach where they drank alcohol and smoked a "blunt." Vazquez saw defendant drink beer but was unsure if he smoked marijuana. They then left the beach. At the corner of Damen and Division, a black truck turned left in front of them, and defendant said, "that's them." Defendant followed the truck and tapped

---

[3]The videotaped statement was not published to the court and is not included in the record on appeal.

its rear end. Defendant explained that a few weeks before, the truck "rode up" and someone inside shot him.

¶ 9    Defendant ultimately rammed the truck. Vazquez, Ventura, and defendant then exited the Nissan. Vazquez and Ventura ran to one of the truck's passengers. When Vazquez realized this person was not a "gang banger," he told Ventura and they returned to the Nissan. Vazquez then heard five or six gunshots and saw defendant fire into the truck's driver's side window. Defendant then entered the Nissan holding the firearm and began driving away, but the Nissan "shut off." Vazquez then fled.

¶ 10    During cross-examination, Vazquez admitted prior convictions for residential burglary and driving under the influence. He spoke to the police on April 25, 2014, after he was handcuffed and taken to a police station. Initially, he denied knowing about the shooting but he eventually related what happened.

¶ 11    Vazquez further testified that defendant hit the truck three to four times. After the collision, the hood of the Nissan was bent and flew up. When the Nissan stopped, Vazquez ran to the truck and that was when he noticed that its occupants were not gangbangers. He also kicked a window of the truck and thought he hit a "fat guy" in the face. He then testified he did not remember these actions, but that they happened if detectives had "it on paper." He did not remember telling the police that defendant said, "that's them."

¶ 12    Caproni testified that on the evening of April 18, 2014, she picked up defendant in her Nissan and then picked up Vazquez, Rivera, Ventura, and Rodriguez at Kedzie Avenue and Pierce Avenue. The group went to a liquor store and then back to Kedzie and Pierce. Defendant, Vazquez, Rivera, and Ventura entered a building and exited 10 minutes later. Rivera had a firearm.

Defendant told Caproni to open her vehicle's hood and that the firearm was there "just in case anything happen[ed]." Defendant then asked to drive the Nissan and Caproni agreed. The group went to Montrose Beach where they drank and smoked marijuana.

¶ 13    Later, at the intersection of Damen and Division, someone in the back seat "spotted someone" in another vehicle. At trial, Caproni thought Vazquez made the statement but was not sure and admitted that she had not previously identified the speaker. Defendant made a quick U-turn, chased the other vehicle, and rammed it three or four times. The occupants of the other vehicle began throwing bottles. Although Caproni told defendant to stop, he did not. When asked if she knew why defendant chased the vehicle, Caproni answered, "[s]upposedly something about him getting shot."

¶ 14    Eventually, following a collision, the men exited the Nissan and ran toward the other vehicle. Caproni also exited the Nissan and saw defendant and the other men fighting. Rodriguez then went to the front of the Nissan. Caproni heard gunshots, but did not see the shooter. She was scared and "ducked" down. When she got back up, everyone returned to the Nissan and defendant drove down an alley.

¶ 15    After about a block and a half, the group left the Nissan. Vazquez and Rodriguez went one way and Caproni, defendant, and the others went another. The men removed their black hoodies and threw them into the garbage in an alley. The group walked to a gas station, where they were questioned by police and "let go" after Caproni said the men were with her. The group then got a taxi. After dropping Rivera and Ventura off, Caproni and defendant went to his house where she spent the night. The next morning, defendant told her to report the Nissan stolen.

¶ 16    On April 20, 2014, police visited Caproni. Initially, Caproni did not talk to the police, but she later told them what happened and identified the people in her vehicle. She gave a videotaped statement and testified before the grand jury. Caproni acknowledged identifying a photograph of defendant as the driver of the Nissan in the videotaped statement.

¶ 17    At trial, Caproni testified that she identified defendant as the shooter because the police threatened that she would never see her daughter again and would get "30 or more years." She had to identify "somebody," and defendant was the first person who "popped" into her head. She admitted telling the police that she saw defendant receive a firearm from Rodriguez, walk to a black SUV, and fire three times into the vehicle. She gave the same information to an assistant State's Attorney (ASA) and in her videotaped statement. Although she said in the statement that she was treated well and was speaking voluntarily and freely, she was scared. She told no one that she was forced to make the statements. She told the grand jury that defendant was the shooter and she observed him fire three times into the black SUV. However, Caproni asserted that she told the trial court the truth.

¶ 18    The State sought to admit Caproni's videotaped statement and grand jury testimony as substantive evidence.[4] Trial counsel objected because Caproni acknowledged her prior statements and the grand jury transcript "speaks for itself." Counsel further argued that Caproni was asked specific questions regarding her grand jury testimony and it would be inappropriate to admit the entire transcript. The trial court clarified that the State was not trying to admit the entire transcript, but sought to perfect impeachment as to "particular portions." The State replied that it sought leave

_____

[4]Neither the videotaped statement, People's Exhibit No. 7, nor the grand jury transcript is included in the record on appeal.

to admit the grand jury transcripts and videotaped statement as substantive evidence. However, the State then said that the parties would agree on what was impeaching and what was not, and the State would admit only the agreed-upon sections as substantive evidence. Trial counsel replied, "That's fine."

¶ 19    When the direct examination resumed, the State asked Caproni whether she previously read the grand jury transcript in its entirety. She acknowledged that she had and that in the transcript she stated that defendant and Rivera put a firearm in the engine of the Nissan, that defendant and Rivera tried to fight with the truck's occupants, and that Rodriguez gave defendant the firearm which he used to shoot Ramirez. She further acknowledged that she did not state in either the videotaped statement or before the grand jury that she was threatened or scared.

¶ 20    During cross-examination, Caproni testified that she understood she could be charged with perjury. Trial counsel asked whether she remembered visiting his office in December 2016, and the State objected on the basis that counsel was trying to bolster a prior consistent statement. Trial counsel responded this was not the "first time" Caproni changed her story, and the court overruled the objection. Caproni admitted telling counsel and his secretary that she did not see defendant with a firearm or the shooting, was under "a lot of pressure" from the police, and felt she had to give them a name. She made similar statements to trial counsel in May 2017 and met with his investigator prior to trial.

¶ 21    Chicago police officer Kriv testified that he was on Marshfield Avenue just west of Ashland and Hubbard when he heard two crashes and then four or five gunshots.[5] When Kriv

---

[5]Officer Kriv's first name is not included in the report of proceedings.

arrived at the scene, he observed a Nissan "taking off." Kriv looked inside an Explorer and saw a dead body with several gunshot wounds.

¶ 22    Chicago police investigator Brian Smith testified that he recovered blood and two fired bullets from the Explorer and processed the vehicle for fingerprints. Smith recovered a baseball cap, a gray hoody, a gray shirt, and a black hoody from a nearby ally.

¶ 23    The State presented evidence establishing that defendant's DNA was found on one of the recovered sweatshirts. The State also entered a stipulation that Ramirez's autopsy showed gunshot wounds to the left temple, right eyelid, left thigh, and left leg, these wounds caused his death, and his blood tested positive for cocaine and negative for opiates.

¶ 24    Chicago police detective Dale Potter testified that during his investigation, he determined that the Nissan was registered to Caproni. During an April 20, 2014 conversation with Caproni, Potter learned the identity of the Nissan's passengers and about the shooting. Caproni was upset her vehicle was destroyed. Potter denied threatening Caproni with either jail or the Department of Children and Family Services. Caproni spoke with an ASA several days later. Potter also spoke with Michael, and following that conversation, Michael identified defendant in a photographic array as the driver. During cross-examination, Potter acknowledged that Caproni was transported to the station for an interview, but Potter did not think she was in custody.

¶ 25    At the close of the State's case, the State asked to admit its exhibits into evidence and rested. The trial court asked if there was any objection, and trial counsel answered no. The defense then moved for a directed verdict, arguing that Michael, Vazquez, and Caproni were not the "kind of people" the trial court should find reliable and credible. Trial counsel noted that Caproni gave two different versions of the shooting under oath and the court had to determine which to believe.

The State responded that Caproni was consistent with the police, in the video statement, and before the grand jury, and only "negated" her story in front of defendant. The trial court denied the motion.

¶ 26    The defense entered a stipulation that additional tests on the sweatshirt which had tested positive for the presence of defendant's DNA indicated that it may not have been in the environment of a discharged firearm, and if it was, gunshot residue particles were not deposited, were removed by activity, or were not detected. The defense then agreed to the State's stipulation that no gunshot residue was found on the other sweatshirt or the hat.

¶ 27     Following the close of the defense case, the parties made closing arguments. The trial court noted this was a "serious case," it needed time to review its notes and the exhibits, and that it would render judgment on October 5, 2017.

¶ 28    On October 5, 2017, the court asked the parties whether anything else needed to be put on the record. The State answered no. Trial counsel stated that he met with the State to review and approve the evidence that would go "back" to the court. The court noted that the parties "had a meet and consent where they went over the various exhibits that [were] *** previously admitted." The court thanked "the parties for doing that so that the [c]ourt can have the actual exhibits in this case to continue [its] deliberations."

¶ 29    The trial court found defendant guilty of first degree murder. The court stated that, after reading Caproni's statement, watching her videotaped statement, and reviewing her grand jury testimony, it found everything she said to be "completely credible." The fact Caproni cooperated with authorities until the time of trial "suggested| to the court that she may have been "forced" to "backtrack" in her trial testimony. However, the court noted that the prior statements were "real

evidence," not just impeachment, and in those prior statements she identified defendant as the driver of the Nissan and the shooter.

¶ 30 Defendant filed a motion for a new trial. After hearing argument, the trial court denied the motion, finding in pertinent part that the court was "very comfortable" with its credibility determinations and that it was "clear" that Caproni was scared in the courtroom. After a hearing, the trial court sentenced defendant to 40 years in prison.

¶ 31 On appeal, defendant first contends that he was not proven guilty beyond a reasonable doubt when the evidence was inconsistent and the actions of the "primary actors as described" were improbable.

¶ 32 When a defendant challenges his conviction based upon the sufficiency of the evidence presented against him, we must ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. All reasonable inferences from the record must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Brown*, 2013 IL 114196, ¶ 48. A reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Id*. A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of his guilt. *Id*.

¶ 33    Here, defendant was found guilty of first degree murder in that he performed certain acts and knew that such acts created a strong probability of death or great bodily harm to Ramirez. See 720 ILCS 5/9-1(a)(2) (West 2014).

¶ 34    The evidence at trial established that defendant, who was driving the Nissan, rammed the Explorer repeatedly, causing a collision. Vazquez testified that defendant believed the Explorer carried someone who previously shot him, exited the Nissan, and used the firearm defendant previously placed under the Nissan's hood to repeatedly shoot Ramirez. See *People v. Smith*, 185 Ill. 2d 532, 541 (1999) ("The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict.").

¶ 35    Moreover, although Caproni did not identify defendant as the shooter at trial and testified that she only identified him in the past because she was threatened by the police, her prior identifications of defendant as the shooter in a videotaped statement and before the grand jury were admitted as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2014)) (allowing certain prior inconsistent statements to be admitted as substantive evidence when they contradict the witness's testimony at a hearing or trial and the witness is subject to cross-examination). Taking all the evidence in the light most favorable to the State, as we must, there was sufficient evidence from which a rational trier of fact could have determined that defendant was the shooter. *Brown*, 2013 IL 114196, ¶ 48.

¶ 36    Defendant nevertheless contends that Caproni and Vazquez were not worthy of belief due to inconsistencies in their testimony. He notes that although Caproni testified that Rodriguez gave the firearm to defendant, Vazquez never "clearly" testified that he was accompanied by a woman

or clarified Rodriguez's role in the shooting. Defendant also notes that no witness corroborated Caproni's testimony that the passengers of the two vehicles fought after the crash.

¶ 37 However, it is the responsibility of the trier of fact to resolve conflicts in the testimony and draw reasonable inferences from the facts presented at trial. *Id*. Moreover, the record refutes the alleged inconsistencies. Vazquez testified that he and his female companion were picked up by defendant and Caproni, and admitted that he hit a "fat guy" in the face. As for the fact that Vazquez did not indicate whether Rodriguez was involved in the shooting, a rational factfinder could find that Vazquez's failure to comment on this matter could be explained where he testified that he exited the Nissan and ran to the truck whereas Caproni, who saw Rodriguez at that time, stayed near the Nissan.

¶ 38 Defendant further contends that it is contrary to human experience to hide a firearm under the hood of a vehicle and then use that vehicle as a battering ram, and that anyone could have grabbed the firearm. Defendant also discounts that he would spontaneously say "that's them," and posits that forensic testing on the recovered bullets could have "substantially strengthened" the defense. Ultimately, defendant's arguments are a request to reweigh the evidence in his favor and substitute our judgment for that of the trier of fact. This we cannot do. See *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991) ("A reviewing court has neither the duty nor the privilege to substitute its judgment for that of the trier of fact.").

¶ 39 In the case at bar, it was the responsibility of the trial court, as the trier of fact, to determine witness credibility and resolve any inconsistencies and conflicts in the evidence. *Brown*, 2013 IL 114196, ¶ 48. Here, as evidenced by its guilty finding, the trial court found the identifications of defendant by Vazquez and Caproni to be credible. When weighing evidence, the trier of fact is not

required to disregard inferences flowing naturally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. A defendant's conviction will be overturned only if the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of his guilt (*Brown*, 2013 IL 114196, ¶ 48); this is not one of those cases. We therefore affirm defendant's conviction for first degree murder.

¶ 40    Defendant next contends that he was denied the effective assistance of counsel when counsel failed to object to object to the admission of Caproni's "entire recorded statement and grand jury testimony," which prejudiced him and improperly bolstered Caproni's credibility based on prior consistent statements contained therein. He further argues nothing in the record shows the parties agreed as to which portions of the grand jury testimony and videotaped statement would be admitted into evidence.

¶ 41    We review a claim of ineffective assistance of counsel pursuant to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a defendant to establish that counsel provided deficient performance and that this deficient performance prejudiced the defendant. *People v. Brown*, 2017 IL 121681, ¶ 25. To establish deficient performance, the defendant must establish that counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To establish prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that [the] defendant may have been prejudiced." *People v. Patterson*, 2014 IL

115102, ¶ 81. A defendant must satisfy both prongs of *Strickland*, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010).

¶ 42    Here, defendant's argument is rebutted by the record when trial counsel specifically objected to the admission of the videotaped statement and grand jury testimony in their entirety, then agreed to review the exhibits with the State to determine which portions should be admitted as substantive evidence, and later informed the court that he met with the State to review the exhibits. The trial court, in turn, confirmed that the parties "had a meet and consent where they went over the various exhibits that [were] *** previously admitted." To the extent defendant posits this record does not establish that Caproni's grand jury transcript and videotaped statement were not admitted into evidence in full, his claim is speculative and unsupported where neither the grand jury transcript nor the videotaped statement is included in the record on appeal. As the appellant, it is defendant's burden to present a complete record for review, and we will construe any doubts arising from the incomplete record against him. *People v. Smith*, 406 Ill. App. 3d 879, 886 (2010); see also *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Accordingly, defendant's claim that he was denied the effective assistance of trial counsel must fail.

¶ 43    For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 44    Affirmed.