2020 IL App (1st) 172688-U

Nos. 1-17-2688 and 1-18-0283 (cons.)

Order filed August 20, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 DV 10031 |
| | ) | |
| STEVEN NEWBOLDS, | ) | Honorable |
| | ) | Laura Bertucci-Smith, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for stalking is affirmed over his contention that the evidence was insufficient to establish he acted without lawful justification or threatened the victim.

¶ 2    Following a bench trial, defendant Steven Newbolds was convicted of stalking and sentenced to five years' imprisonment. In this consolidated appeal, defendant argues the State failed to prove beyond a reasonable doubt that he (1) lacked lawful justification when he waited

for Theresa Swenson on her way home from work, and (2) threatened to kill her. For the following reasons, we affirm in part and dismiss in part.[1]

¶ 3     Defendant was charged by information with one count of stalking (720 ILCS 12-7.3(a-3)(1) (West 2016)). The information alleged that on or about July 27, 2016 and continuing through November 8, 2016, defendant knowingly and without lawful justification followed or placed Swenson under surveillance on at least two separate occasions. Specifically, defendant was alleged to have followed Swenson from work on July 28, 2016, watched her walk to work on August 23, 2016, and transmitted a threat to kill her.

¶ 4     Swenson testified that she met defendant on an online dating site. Five or six months into their relationship, they began living together in a Chicago suburb and later moved to an apartment in the South Loop with only Swenson's name on the lease. On the morning of July 22, 2016, Swenson and defendant fought and defendant left their apartment. That night, Swenson found a suicide note from defendant on her counter. Swenson looked for defendant, and he eventually answered her phone calls. The next morning, they broke up. Swenson allowed defendant to use her vehicle to remove his possessions from the apartment.

¶ 5     From July to November 2016, defendant and Swenson exchanged numerous text messages, emails, and Gchat communications. Swenson read printouts of those messages in court, which the State included in several exhibits. Because of the relevance of these messages, we quote them at length.[2]

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] While actual copies of the messages in question were entered into evidence, for the sake of clarity, we will transcribe Swenson's reading of them on the witness stand rather than the messages themselves unless otherwise noted.

¶ 6    On July 24, 2016, defendant asked if Swenson was "done" with him, and she replied, "no going back. I can't do it anymore."

¶ 7    On July 25, 2016, Swenson messaged defendant that he had emotionally hurt her, and that they could not be friends until defendant earned her trust and took care of himself. She wrote that defendant scared her by the way he talked and "the threats." Swenson also told defendant that she did not trust him in her apartment because of the way he treated her.

¶ 8    Swenson testified that, on July 26, 2016, defendant still had her vehicle and she was not sure where it was. Defendant messaged her saying, "you may want to go back and get your car," and Swenson responded, "let them tow it. I'm too scared to be around you." Swenson later wrote that she could not be with defendant after what he had "done" to her, and that she had trouble working, sleeping, and walking to work because she thought he was "stalking" her. She testified that since their breakup, she had people walk her to and from work because defendant waited outside for her and she did not feel safe by herself.

¶ 9    By July 27, 2016, Swenson tried to not respond to defendant's messages to avoid provoking him. That morning, Swenson filed a police report because defendant refused to return the keys to her vehicle. The police retrieved her vehicle, and she picked it up at the police station. Later that day, defendant accused Swenson of being with another man, demanded the man's name and said he would "stab the guy," called Swenson a "f*** whore," and said, "[g]uess who dies now?" Swenson testified that she had not been with another man, and defendant's messages made her feel "[h]orrible," "scared," and unsafe.

¶ 10    On the morning of July 28, 2016, Swenson met defendant briefly and allowed him to charge his phone in her vehicle because he had been living on the street. Swenson told defendant that their

relationship was over. Later that day, defendant messaged Swenson asking if he could walk her home in the rain. Swenson responded, "there is no us anymore." Defendant stated that he was working on himself and that it would be nice for him to bring her an umbrella. Swenson replied they could not be friends until she saw him taking care of himself, that she needed space, and that she already had an umbrella.

¶ 11    Swenson walked home from work that day with her friend and coworker, Alicia Stepanek. On their walk, Swenson saw defendant on a corner with an umbrella and a big cardboard sign, which stated he was sorry for hurting Swenson, loved her, and wanted to be with her. When Swenson and Stepanek saw defendant, they turned to avoid him and Swenson refused the umbrella he offered. Swenson and Stepanek continued to walk but saw defendant again a couple minutes later and he again offered Swenson an umbrella. Eventually, Swenson accepted the umbrella and kept walking. Throughout her walk, Swenson was scared that defendant was following her.

¶ 12    After Swenson reached home, defendant messaged her that she "didn't have to walk around" because he did not intend to see her. Swenson told defendant to stop stalking her and that she did not feel safe. Defendant responded that he would have a "dunce cap" and "new sign" the next day and would show Swenson she meant everything to him. He added that "[a]ny other woman would love to see their man do something like that," and "deep down" Swenson loved him for doing it too.

¶ 13    Swenson again wrote that defendant was stalking her and that she could not work, sleep, or eat because defendant was "around every corner." Defendant stated, "I'm not stalking in a bad way babe. I'm so confused why you're scared of me." Swenson replied, "there is no good stalking."

Swenson testified that by telling defendant there was no good stalking, she meant that defendant "seemed to think" following her was okay, and it was not.

¶ 14    On August 4, 2016, Swenson blocked defendant's phone number. Afterwards, Swenson began receiving text messages from phone numbers she did not recognize. On August 7, 2016, she received messages telling her to pack up some of the sender's belongings and asking, "You think we can start acting like civil human being[s] yet? Stop being mean and hurtful." Swenson told the sender, whom she understood to be defendant, to stop contacting her and that she would have his belongings delivered to him or put somewhere where he could get them by the next weekend.

¶ 15    On August 9, 2016, Swenson received messages from a different number. One stated, "I'll make sure your friends list has pics of you naked." Swenson responded that she would file a "harassment suit" and obtain an order of protection. The sender, whom Swenson again understood to be defendant, said, "go ahead you lied you whore." Swenson blocked the number and filed a police report against defendant.

¶ 16    On August 11, 2016, defendant sent Swenson an email stating, "you ripped my heart" and "I'm spending every [w]aking moment to ruin your life just like you have ruined mine."

¶ 17    On August 12, 2016, Swenson filed a petition for an emergency order of protection against defendant, which the court granted until September 2, 2016. The order directed defendant to stay away from Swenson, including refraining from telephone calls, mail, email, faxes, written notes, and communication through third parties, and also prohibited him from entering or remaining at her office or residence.

¶ 18    On August 13 and 14, 2016, Swenson received voicemails from defendant, which were played in court. In the voicemails, defendant repeatedly asked why they broke up and for her to

call him to discuss their relationship. On August 14, 2016, Swenson filed a police report against defendant.

¶ 19    On August 15, 2016, Swenson was at her parents' house in a Chicago suburb because she did not feel safe being around defendant in the city. Swenson did not tell defendant that she was going there. The next morning, Swenson's father found flowers and a card from defendant on Swenson's vehicle in the driveway. In the card, defendant apologized to Swenson and expressed his love and desire to get back together. Swenson called the police because she was scared that defendant had found her.

¶ 20    On August 17, 2016, Swenson received several emails from tornapart2@gmail.com. The sender, whom Swenson understood was defendant, complained about not being able to turn on his phone, so Swenson provided him with information on how to do that. Defendant thanked Swenson for her help, told her she was an "amazing woman," that he hoped she liked the flowers and card, and that he loved her. Swenson blocked that email address.

¶ 21    On August 18, 2016, Swenson received multiple emails from homelessonthestreets2@gmail.com. One email read, "Good to see you killed all the lights and it's just the TV." When she received the email, Swenson was in her apartment, had just turned off the lights, and was watching television. On August 20, 2016, Swenson awoke in her apartment to a loud knock at her front door. Swenson looked through the peephole and saw defendant. Defendant had also left Swenson multiple voicemail messages. Swenson called her building's front desk security and the police to file a report against defendant.

¶ 22    Later that afternoon, Swenson received a series of emails from homelessonthestreet2@gmail.com. Defendant thanked Swenson for letting him see her cats, said

he would not go anywhere until she talked to him, and "you know what's going to happen when I see him don't you? He's got to leave sometime babe. And I'll be waiting until he does." Swenson had not let defendant see her cats in person. She blocked the email address.

¶ 23    On August 23, 2016, Swenson took an Uber to work, which dropped her off around the corner from her office. As she walked to the building, defendant drove by on a motorcycle and threw a note at her. The State published surveillance video from outside the building, which Swenson testified accurately depicted the incident.

¶ 24    Later that morning, Swenson received an email from pleasetalktometracy@gmail.com. The sender, whom Swenson understood was defendant, asked for Swenson to talk to him, stated that he was not going anywhere "except [his] grave" without her, and that his life meant nothing to him without her. Swenson did not respond to the email and blocked the email address.

¶ 25    On August 30, 2016, defendant left a cardboard sign outside Swenson's office building, which was captured on surveillance video.

¶ 26    On September 2, 2016, Swenson was granted a plenary order of protection against defendant by default, which directed defendant to stay away from her, including refraining from telephone calls, mail, email, faxes, written notes, and communication through third parties. It also prohibited defendant from entering or remaining at Swenson's workplace or residence.

¶ 27    After that date, defendant continued to contact Swenson, so on September 6, 2016, she filed a police report against him.

¶ 28    On September 12, 2016, Swenson received an email from pleasedontsendmetojail@gmail.com with the subject line, "Why?" The email stated that the

sender, whom Swenson understood was defendant, could not "take much more" and begged Swenson to talk to him.

¶ 29   On October 27, 2016, Swenson received two emails from tinkb0610@gmail.com with the name "Wrong Person" associated with them. One of Swenson's own email addresses at the time was tinkb1313@gmail.com, and she believed defendant created the address to mimic her own and reflect her birth date. The first email stated, "must people die must we lose those we love. How far will it go only you can [end] it before it's too late. *** You know what you need to do to stop it." The second email contained an audio attachment of defendant singing along with a song. That same day, Swenson received more emails from that address, including one that stated, "All could end."

¶ 30   On October 27 and 28, 2016, Swenson received Gchat communications, which connected to the name "Wrong Person" and the email address tinkb0610@gmail.com. Two messages from October 27 said, "time is ticking, bad things will happen soon stop," and "must someone really die? Keep it up and see." Swenson filed a police report that day. On October 28, another message said, "close your eyes and you'll see." Between October 28 and 31, 2016, Swenson received five phone calls from "Wrong Person."

¶ 31   On November 5, 2016, Swenson received an email from tinkb0610@gmail.com with the subject line "It Still Hurts with you" and a song attachment. Later that day, she received another email from that address with the subject line "okay," which stated:

> "I love how you've lost all that weight. Hate to do it, but I see you want everything
> to continue on this path that you're going on. It could all end so easy, but it looks like you

want it to continue. So fire will start in one hour. All the precious memories, those things that can't be replaced will be a pile of ashes." Swenson testified that she had lost weight since she and defendant had broken up.

¶ 32     On November 6, 2016, Swenson received an email from tinkb0610@gmail.com with the subject line "Burnt," which read, "All those memories and *** [irreplaceable] things gone just ashes in the window. What happens next wait and see." The email also included a photograph attachment of burning papers. On November 7, 2016, Swenson received an email from tinkb0610@gmail.com with the subject line, "I ain't a killer don't push me." The email stated, "must you continue to push?" After receiving that email, Swenson filed a police report against defendant.

¶ 33     On cross-examination, Swenson testified that on July 20, 2016, she and defendant argued over text message and she told him to pack his belongings, but later asked him to pick her up from work. On July 21, 2016, defendant told Swenson he was packing, but later that day, she asked him to pick her up from a haircut appointment. At 9 p.m., Swenson messaged defendant that he needed to look for a different place to stay and that their relationship was irreparable.

¶ 34     On July 22, 2016, Swenson found a suicide note from defendant. Swenson text messaged with defendant, eventually welcoming him back into her residence and asking him to drive her to and from work.

¶ 35     On July 23, 2016, Swenson went to her parents' home, and defendant messaged her asking for gas money and to use her vehicle to move out of her residence. Swenson told defendant he needed to move out that day, and defendant indicated he could not do so. Swenson asked defendant to move out by the next day, but that he could continue to use her vehicle and shower.

¶ 36    On July 24, 2016, Swenson messaged defendant asking about the status of his move. He replied that he could not simply "vanish," and they argued through the next day.

¶ 37    On July 26, 2016, defendant asked to enter Swenson's apartment to see her cats and remove his belongings so he could pawn them. Swenson informed him that she had changed the locks, which upset defendant, and he said he would kick down the door.

¶ 38    On July 27, 2016, Swenson retrieved her vehicle from the police station. Later, Swenson told defendant she would put some of his belongings by her parking garage for him, and he informed her that the items were taken. Swenson agreed to leave his backpack and a phone charger there, and defendant repeatedly said he was going to overdose and commit suicide. That night, Swenson drove to her parents' house.

¶ 39    The next morning, defendant messaged a long apology to Swenson. Defendant then asked if Swenson could pick up cigarettes, and she said that she could be by her parking garage around 10 a.m. She also informed him that she was not walking to work, so he had "a better chance of seeing [her] by the parking garage," and that she would look for him there. Around 10 a.m., Swenson unlocked her vehicle so defendant could charge his phone in it, and she went to work.

¶ 40    At 10:34 a.m., defendant messaged Swenson that it was hot in her vehicle, to which she said, "I'm sorry." Defendant then messaged that Swenson could trust him to drop her off and pick her up at work and return her vehicle. Swenson responded, "I can't risk that right now I will be okay getting to work." Defendant messaged, "I just now got you to talk to me and even half way hug me I can't f*** it up now."[3] At 10:38 a.m., Swenson wrote, "I am leaving for work babe."

---

[3] This detail is derived directly from People's Exhibit 1.

Defendant again messaged Swenson that it was hot in her vehicle, and she told him she hoped he had the door open. At 10:52 a.m., defendant messaged Swenson, "I hope you have a great day beautiful," and Swenson responded, "thank you." In the afternoon, defendant asked Swenson about insurance, and she wrote back. Later, defendant asked to meet Swenson to discuss his "plan," and Swenson told him it would "defeat the purpose" if she told him what to do. Swenson testified that she believed that it was "implied" that she did not want defendant to walk her home from work that day.

¶ 41    In August 2016, defendant sent Swenson flowers at work. Swenson thanked him for the flowers but said they were unnecessary.

¶ 42    On January 5, 2017, Swenson called the police to report that she received emails from tinkb0610@gmail.com. At that time, defendant was in jail.

¶ 43    Stepanek testified that she worked with Swenson in July 2016. On July 28, 2016, Stepanek walked Swenson home from work, which she regularly did, and saw defendant standing on a corner with a sign. Stepanek and Swenson walked past defendant, who told Swenson to listen to him and read his sign, and that other people read it and felt sorry for him. A block later, defendant again approached the women and told Swenson to take an umbrella he offered.

¶ 44    Swenson's father, Tim Traynor, testified that on August 16, 2016, he found flowers and an envelope on Swenson's vehicle, which was parked in his driveway.

¶ 45    Alea McNellis testified that she was an IT administrator for Swenson's employer on August 30, 2016. When she arrived to work on that date, she found a cardboard sign in front of the building's door. The State published a photograph of the sign, which stated "homeless & heart broken please smile love her like no tomorrow."

¶ 46    Rafael Barajas testified that he was an IT administrator in Swenson's office building, where he managed the surveillance system. Video from August 30, 2016, captured a man dropping something off at the building's door.

¶ 47    The State entered a stipulation that, if called to testify, Dekalb County Sheriff's Office Sergeant David Aranda would testify that on August 25, 2016, he served defendant with an emergency order of protection issued on August 12, 2016. The State also entered a stipulation that, if called to testify, Dekalb County Sheriff's Office Detective Jackie Hill would testify that on September 15, 2016, she served defendant a short form notification of an order of protection issued on September 2, 2016.

¶ 48    The court found defendant guilty of stalking. In so doing, the court stated that the evidence established that defendant followed Swenson on July 28 and August 23, 2016, with the requisite knowledge and intent. Moreover, defendant impliedly threatened Swenson with his communications to her on October 27 and 28, 2016 and November 9, 2016.

¶ 49    Defendant filed a motion to reconsider or alternatively, for a new trial, which he amended to argue that the State failed to prove him guilty beyond a reasonable doubt and that some of the State's electronic evidence was admitted without an adequate foundation. On August 17, 2017, the court denied the motion, and following a hearing, sentenced defendant to five years' imprisonment. That same day, defendant filed a timely notice of appeal (appeal No. 1-17-2688).

¶ 50    Subsequently, on December 1, 2017, defendant filed an amended motion to reconsider sentence in the trial court, which the court denied without addressing its untimeliness.[4] Defendant filed a notice of appeal from that order (appeal No. 1-18-0283).

¶ 51    On March 28, 2019, this court entered an order allowing defendant's motion to consider the record filed in appeal No. 1-18-0283 as part of the record for appeal No. 1-17-2688. Then, on May 29, 2019, this court entered an order allowing defendant's motion to consolidate the two appeals.

¶ 52    Before reaching the merits of defendant's argument on appeal, we must address our jurisdiction in appeal No. 1-18-0283. As noted, this appeal arose from the denial of defendant's amended motion to reconsider sentence. In defendant's brief on appeal, counsel concedes that defendant's amended motion to reconsider sentence was "untimely," and posits that appeal No. 1-18-0283 is, therefore, "invalid." We agree. "[A]fter a notice of appeal is filed with a reviewing court, appellate jurisdiction attaches *instanter*; the lower court loses jurisdiction and any actions taken by it when it has no jurisdiction are null and void." *People v. Stevenson*, 2011 IL App (1st) 093413, ¶ 43. As defendant filed a notice of appeal after his sentencing hearing on August 17, 2017, the trial court had no jurisdiction to rule on defendant's amended motion to reconsider sentence filed on December 1, 2017. Because the trial court lacked jurisdiction, we vacate its denial of defendant's amended motion to reconsider sentence, order that the amended motion to reconsider sentence be dismissed, and dismiss appeal No. 1-18-0283. See *People v. Bailey*, 2014 IL 115459, ¶ 29.

---

[4] The record on appeal does not contain defendant's original motion to reconsider sentence, nor do the half-sheets specify when the original motion was filed.

¶ 53    On appeal, defendant argues the State failed to prove him guilty of stalking beyond a reasonable doubt. Specifically, defendant contends the evidence did not show that (1) he was without lawful justification when he waited for Swenson on her way home from work on July 28, 2016, and (2) he threatened to kill her because the messages she received in October and November 2016 were too vague to constitute a threat.

¶ 54    When a defendant challenges his conviction based upon the sufficiency of the evidence presented against him, we must ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find all the elements of the crime proven beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. All reasonable inferences are allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. Credibility issues, resolution of conflicting or inconsistent evidence, weighing the evidence, and making reasonable inferences from the evidence are all reserved for the trier of fact. *Brown*, 2013 IL 114196, ¶ 48. We will not overturn a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 55    To sustain a conviction for stalking under section 12-7.3(a-3)(1) of the Criminal Code of 2012 (Code), the State must prove beyond a reasonable doubt that a defendant "knowingly and without lawful justification, on at least 2 separate occasions" followed or placed another person "under surveillance" and "at any time transmit[ted] a threat of immediate or future bodily harm, sexual assault, confinement or restraint and the threat is directed towards that person." 720 ILCS 5/12-7.3(a-3)(1) (West 2016). In turn, section 12-7.3(c)(5) of the Code defines following another person as "(i) to move in relative proximity to a person as that person moves from place to place or (ii) to remain in relative proximity to a person who is stationary or whose movements are

confined to a small area." 720 ILCS 5/12-7.3(c)(5) (West 2016). Section 12-7.3(c)(7) of the Code defines placing someone under surveillance, in relevant part, as "remaining present outside the person's school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant." 720 ILCS 5/12-7.3(c)(7) (West 2016). Finally, section 12-7.3(c)(9) of the Code defines transmitting a threat as "a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements or conduct." 720 ILCS 5/12-7.3(c)(9) (West 2016).

¶ 56    Defendant first asserts that the State failed to prove that he acted without lawful justification when he waited for Swenson on her walk home from work on July 28, 2016, because Swenson met with him in the morning and they exchanged pleasant text messages throughout the day. To determine whether someone is without legal justification for purposes of the stalking statute, the issue is whether the trier of fact could conclude that a defendant's actions were unjustified because they placed another "in apprehension of bodily harm." *People v. Zamudio*, 293 Ill. App. 3d 976, 983 (1997).

¶ 57    Here, on July 27, 2016, defendant repeatedly messaged Swenson. He accused her of being with another man, threatened to stab that man, called her a "f*** whore," and said "[g]uess who dies now?" On July 28, 2016, defendant messaged Swenson asking to walk her home from work, and Swenson told him "there is no us anymore." When defendant protested, Swenson stated that she needed space from him. Despite Swenson's statements, defendant waited for her on her walk home with a sign. When Swenson saw defendant, she tried to avoid him and kept walking, but he appeared again a couple minutes later. Defendant emphasizes that earlier that day, Swenson allowed defendant to charge his phone in her vehicle and they exchanged text messages in which

she apologized for her vehicle's temperature, thanked him for telling her to have a good day, and responded to his question about insurance. However, these communications must be viewed in the context of Swenson's other relevant communications with defendant and the details of the incident. Based on their conversation the day prior and Swenson's repeated objection to defendant's offer to walk her home on July 28, it was not unreasonable for the court to conclude that defendant's act of waiting for Swenson on her walk home on that date put Swenson in apprehension of bodily harm, and therefore, was unjustified. See *id.*

¶ 58 Defendant next asserts that the State failed to prove that he transmitted a threat to Swenson because the messages she received were "too vague" based on his past threats to kill himself. We disagree. In October 2016, Swenson received multiple emails referencing people dying and losing loved ones. Swenson also received Gchat messages stating that time was "ticking," "bad things" would happen soon, and "must someone really die? Keep it up and see." In November 2016, Swenson received an email stating, "Hate to do it, but I see you want everything to continue on this path that you're going on. It could all end so easy, but it looks like you want it to continue," and that a fire would soon turn "precious memories" into a "pile of ashes." Another email contained a photograph attachment of burning papers and the comment, "What happens next wait and see." A third email had the subject line, "I ain't a killer don't push me," and stated, "must you continue to push?" Viewed in a light most favorable to the State, a trier of fact could reasonably find that defendant's messages to Swenson were threats to kill her, even if there was evidence that in the past he had only threatened to kill himself. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009) ("the trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt").

¶ 59　For the foregoing reasons, we affirm the judgment of the circuit court in appeal No. 1-17-2688, and dismiss appeal No. 1-18-0283.

¶ 60　No. 1-17-2688, Affirmed.

¶ 61　No. 1-18-0283, Dismissed.