2023 IL App (1st) 220476-U

No. 1-22-0476

Order filed October 18, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 18 CR 718 |
| | ) | 18 CR 719 |
| | ) | 18 CR 6574 |
| | ) | |
| DEREK LARBIE, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE R. VAN TINE delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for attempted home invasion over his contention that the State failed to prove his guilt beyond a reasonable doubt.

¶ 2    Following a jury trial, defendant Derek Larbie was found guilty of one count of home invasion causing injury (720 ILCS 5/19-6(a)(2) (West 2016)) in case number 18 CR 718, one count of attempted home invasion (720 ILCS 5/8-4(a), 19-6(a)(2) (West 2016)) in case number 18 CR

719, and one count each of home invasion causing injury (720 ILCS 5/19-6(a)(2) (West 2016)) and aggravated criminal sexual assault causing bodily harm (720 ILCS 5/11-1.30(a)(2) (West 2016)) in case number 18 CR 6574.[1] Defendant was sentenced to an aggregate term of 35 years' imprisonment. On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt of attempted home invasion in case number 18 CR 719.[2] We affirm.

¶ 3                                             BACKGROUND

¶ 4     The State's evidence showed that on July 20, 2017, defendant entered D.F.'s apartment without authority and committed an act of sexual penetration upon her.[3] The State proceeded to trial on four counts of home invasion, two counts of aggravated criminal sexual assault, and two counts of residential burglary (case number 18 CR 6574).

¶ 5     The State's evidence showed that on July 21, 2017, defendant entered D.F.'s apartment, placed a pillow over her face, and applied pressure. The State proceeded to trial on one count of attempted murder, one count of home invasion, two counts of residential burglary, one count of aggravated battery, and one count of unlawful restraint (case number 18 CR 718).

¶ 6     The State's evidence showed that on July 26, 2017, a surveillance camera at the rear door to the residence captured defendant and another individual entering the "enclosed rear porch" of D.F.'s apartment. The State proceeded to trial on one count of attempted home invasion and one count of residential burglary (case number 18 CR 719). Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of attempted home invasion.

---

[1] On November 22, 2019, the trial court ordered that the three cases be joined and tried together.

[2] Defendant does not challenge his other convictions.

[3] To preserve anonymity, we refer to the victim by her initials and her cousin by her first name and last initial.

¶ 7    At trial, D.F. testified that in July 2017 she lived in an apartment with her cousin Vanessa G., near DePaul University where she attended school. D.F. lived on the top floor of the building. From the front, the apartment was reached by traversing two flights of stairs, separated from each other by a locked door. Another locked door at the rear of the building led to a different internal stairwell running directly to D.F.'s apartment. Ground floor windows opened into the laundry unit in the basement, from which the rear internal stairwell was accessible.

¶ 8    In the apartment, a walk-in pantry opened into the sunroom, from which the same rear internal stairwell was also accessible. The pantry contained a window low to the floor which opened to the rear internal stairwell. According to D.F., the window to the stairwell was not locked, and occasionally was used by D.F. and Vanessa to enter the apartment if they forgot their keys. On the left side of the building, a walkway led to the alley behind the garage.

¶ 9    Many of the material facts are undisputed on appeal. On July 19, 2017, D.F. and Vanessa went to a nightclub with Vanessa's boyfriend at the time, Alex Cruz, and his friend Stephen Ripoli. Prior to leaving the apartment, D.F., who was 4'11" and weighed approximately 108 pounds, consumed three or four shots of vodka and smoked "[t]wo or three bowls" of marijuana. When they left at approximately 11 p.m., D.F. felt "drunk" but could walk and speak.

¶ 10   Vanessa, the designated driver, drove them to Debonair, a nightclub. They stayed at the club for several hours. D.F. consumed "a couple" of drinks, became loud, and slurred her words. D.F. noticed she was "blocking [sic] out," unable to remember events, and "wasn't mentally there." D.F. remembered meeting defendant outside Debonair but not much else. After Debonair closed, Cruz's friend, Carlos Rodriguez, suggested they go to Evil Olive, another nightclub. Vanessa drove D.F., Cruz, and Ripoli to Evil Olive, and defendant and his friend rode there with Rodriguez. D.F.

stated that she did not remember much about Evil Olive, other than that the bartender offered her a shot and poured whiskey into her mouth directly from the bottle. D.F. did not remember anything else from the second club or how she got home that night. After Vanessa saw that D.F. was "completely intoxicated" and "passed out" at the bar, she decided to take D.F. home. Ripoli, defendant, and his friend helped carry D.F. to Vanessa's car because she was unable to walk and was "basically asleep." Cruz testified that D.F. sat in the back passenger side of Vanessa's car and defendant had his arm wrapped around D.F.'s waist. Ripoli testified that defendant was "handsy" and "[t]ouchy-feely" with her.

¶ 11    When they arrived at the apartment building, defendant carried D.F. to Vanessa and D.F.'s third floor apartment and put D.F. in her bed. Vanessa did not change D.F.'s clothing but took off her shoes and tucked her under the blanket. D.F.'s bedroom door was left open. Vanessa then went downstairs with defendant and his friend and offered to drive them home. When they returned to the car, defendant wanted to go back up to the apartment to look for his phone. Vanessa did not trust defendant and did not allow him to return upstairs; she searched for his phone in the apartment but did not find it. Vanessa then drove them to a subway station a few blocks away and went home. Security camera footage from near the subway station showed that defendant and his friend got into another car with an unknown driver about ten minutes later. The car made a U-turn and stopped close to D.F's apartment.

¶ 12    When D.F woke up the next morning, she saw defendant sleeping next to her in her bed over the covers. She was wearing her shirt from the previous night, but realized she had on pajama shorts instead of the jeans she wore to bed. She did not remember changing clothes. Although D.F. was concerned, she did not remember much of the previous night and believed that maybe she had

invited defendant to her apartment because she did not understand why else he would be in her bed. The door to her room was closed but not locked. She left her room and went back to sleep on the couch. When she woke up, defendant was sitting next to her and they chatted. D.F. thought defendant was "a little bit" flamboyant, and thus "gay," so she believed she had invited him to sleep over "as [a] friend." At some point, D.F. gave defendant her cell phone and he texted himself from her phone. The text he sent included a misspelling of her first name. Vanessa heard D.F. speaking with defendant in the living room and she sat with them, but she was uncomfortable because she did not understand why defendant was in their apartment.

¶ 13    Eventually, D.F. realized that defendant was "interested" in her, so she asked him to leave. After stopping in the bathroom for 10 to 15 minutes, defendant left through the front door. When he left, D.F. and Vanessa discussed the situation. Vanessa told D.F. that Vanessa did not invite defendant inside. They tried to determine how defendant got into the apartment as neither had let him in. D.F. then realized she did not hear the downstairs front door at the bottom of the stairwell close, so Vanessa went to check the stairwell. She saw defendant sitting at the bottom of the stairwell and asked him to leave. Defendant instead walked up the stairs toward the women, which frightened D.F. She screamed for defendant to leave, which he eventually did. Later, Vanessa called Cruz and Ripoli, who denied letting defendant into the apartment.

¶ 14    Later that day, D.F. went to the bathroom and, after wiping her vagina, noticed that she felt sore inside "down there." D.F. and Vanessa then asked Cruz and Ripoli to spend the night because they were afraid that defendant might return. D.F. did not call the police because she was not sure if the information defendant provided was true and she was embarrassed that she had gotten drunk.

That night, Cruz and Ripoli stayed in the apartment. D.F. did not want to sleep in her room, so she slept on one couch, and Ripoli slept on another couch. Cruz slept in Vanessa's room.

¶ 15    The next morning, July 21, D.F. woke to defendant pressing a pillow over her face with his full body weight. She fought him, eventually escaped from under the pillow, and screamed. Her screams woke up Vanessa, Curz, and Ripoli. D.F. recognized defendant by his hairstyle, race, and body shape as he ran toward the open back door of the apartment. Vanessa saw a man with the same hairstyle, size, and shape as defendant run through the back door. Cruz only saw a "shadow" run past him, but Ripoli positively identified defendant before defendant ran out of the apartment. Cruz and Ripoli ran after defendant downstairs, but lost track of him. Afterward, D.F. saw a roll of duct tape behind the couch, which had not previously been in the apartment, and a 10 to 12 inch piece of duct tape stuck to her shirt. She also noticed a small scratch on her top lip, which she did not have before the struggle. Additionally, Cruz and Ripoli discovered that the window in the pantry was open.

¶ 16    D.F. subsequently went to the hospital where a doctor and nurse administered a sexual assault kit, took D.F.'s blood sample, and prescribed her abortion pills and STI medication. Defendant's DNA was found on D.F.'s vaginal swab. D.F. did not consent to defendant entering her apartment or having sex with her.

¶ 17    Shortly thereafter, Cruz installed a freestanding security camera in the rear internal stairwell outside the door to D.F.'s third floor apartment. He also downloaded applications onto his, D.F.'s, and Vanessa's phones, which provided alerts from the camera and a way to view footage. On July 26, 2017, D.F. received a notification from the camera and saw a recorded video of two men "sneaking up" the rear internal staircase and "trying to be quiet." They then look at the

camera, approach it, and "put their *** faces into it." The footage, which has sound, is included in the record on appeal and has been viewed by this court.

¶ 18     In the video, defendant and another man, wearing a hooded sweatshirt with the hood raised, walk up the stairs and stop when they see the camera near the ground. They approach the camera, with defendant crawling on the ground to look at it. The other man picks up the camera, looks at it, then turns it around and sets it down facing the wall. Footsteps can be heard receding.

¶ 19     D.F., Vanessa, Cruz, and Ripoli all recognized defendant in the video as the person who came into D.F.'s home twice and "tried to break in a third time." Chicago police detective Edward Frohnauer entered defendant's first name, physical description, and phone number into a database, and discovered defendant's photograph and full name. Frohnauer used the photograph to compile a six-person photo array, in which D.F., Vanessa, and Ripoli all positively identified the defendant.

¶ 20     In closing, defense counsel argued, *inter alia*, that the State did not establish that on July 26, 2017, defendant intended to "go [to the apartment] and harm" D.F. However, the jury found defendant guilty of attempted home invasion for the July 26 incident.

¶ 21     Defense counsel filed a motion for a new trial, arguing in relevant part that the State failed to prove defendant's guilt on any count. The court denied the motion after a hearing, noting that the State established that no one gave defendant permission to enter the apartment, and the video from Cruz's camera showed defendant "creeping" up the stairs in a "sinister manner." The court commented that the evidence regarding the July 20 and July 21 incidents supported the conclusion that defendant intended to harm D.F. upon entering her apartment on July 26.

¶ 22     Defendant timely appealed.

¶ 23                                   ANALYSIS

¶ 24    On appeal, defendant contends that the State failed to prove him guilty of attempted home invasion beyond a reasonable doubt. Specifically, defendant challenges that the evidence failed to show that he intended to commit home invasion or that he took a substantial step toward that offense. Defendant contends that the July 26 video establishes only that he and another man saw the camera, moved it, and immediately left the scene, and the State presented no evidence "suggesting a nefarious intent."

¶ 25    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *Id.* A reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 26    To prove attempted home invasion as charged, the State had to prove that defendant, with the intent to commit home invasion, performed an act constituting a substantial step toward knowingly entering D.F.'s dwelling without authority, knowing one or more persons were present inside, and with the intent to injure her within the dwelling. 720 ILCS 5/8-4(a), 19-6(a)(2) (West

2016)). Defendant only challenges the State's evidence concerning his intent to commit home invasion and whether he took a "substantial step" toward commission of the offense.

¶ 27    A person acts intentionally "when his conscious objective or purpose is to accomplish" a result or engage in certain conduct. 720 ILCS 5/4-4 (West 2016). Intent can rarely be proven by direct evidence and may instead be inferred from the "surrounding circumstances," and "the character of the defendant's acts." *People v. Dorsey*, 2016 IL App (4th) 140734, ¶ 34; see also *People v. Rios*, 2022 IL App (1st) 171509, ¶ 49 (circumstantial evidence may sustain criminal convictions).

¶ 28    "What constitutes a substantial step is determined by the unique facts and circumstances of each case." *People v. Grayer*, 2022 IL App (1st) 210808, ¶ 44. Mere preparation is not a substantial step, but it is not necessary for a defendant to complete the last proximate act to be found guilty of attempt. *People v. Terrell*, 99 Ill. 2d 427, 433 (1984). A substantial step puts the defendant in a "dangerous proximity to success." (Internal quotation marks omitted.) *People v. Hawkins*, 311 Ill. App. 3d 418, 423 (2000). The offense of attempt is complete upon the completion of a substantial step, and "subsequent abandonment of the criminal purpose is no defense." *Id.* at 424.

¶ 29    Courts have used the Model Penal Code, § 5.01, at 74-75 (1985), which defines attempt using the phrase "substantial step," as guidance. *People v. Jiles*, 364 Ill. App. 3d 320, 333 (2006). Section 5.01 lists conduct which, if corroborative of the defendant's criminal purpose, is not insufficient to show a substantial step as a matter of law, such as the "unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed." See Model Penal Code § 5.01(2)(d), at 74-75 (1985).

¶ 30    Viewing the evidence in the light most favorable to the State, a rational trier of fact could find that defendant was guilty of attempted home invasion. The State established that defendant twice entered D.F. and Vanessa's apartment, without permission, a few days prior to the incident now at issue. Each time defendant entered the apartment, he harmed D.F., first by sexually assaulting her and then by trying to smother her as she slept. Additionally, evidence was adduced that on July 21, 2017, defendant fled through the back door of the apartment into the rear internal stairwell, which leads directly from the ground floor to the apartment, demonstrating his familiarity with that method of access to the apartment.

¶ 31    Further, video recorded by the camera outside the rear door to the D.F.'s apartment shows defendant and an unknown man walking up the internal rear staircase leading directly to the apartment. When the men notice the camera, they examine it, turn it toward the wall, and leave. There would be no reason to be on that staircase except to reach D.F.'s apartment. And it is a reasonable inference the men left only once they ascertained that they were caught on camera and it was recording them. This evidence, taken together, establishes that defendant intended to enter the apartment and, given the pattern of events from that week, attack D.F. yet again.

¶ 32    Defendant nevertheless contends that the State failed to establish that he intended to commit home invasion or made a substantial step toward commission of the offense. He argues that the "mere act" of turning a camera toward a wall does not constitute a substantial step toward the commission of home invasion, because he "immediately" left the premises. Defendant contends that he was not discovered near the scene and was not in "dangerous proximity to success." He additionally contends that the State did not present physical evidence "suggesting a nefarious intent."

¶ 33    We disagree. First, as noted, the July 26, 2017, incident was the third time that defendant entered D.F.'s apartment building without authority within a week. In each prior incident, defendant made it into D.F.'s apartment where he injured her. Further, during the second incident, he was seen escaping through the back door into the stairwell leading directly to the ground floor, the same stairwell he and his companion used to reach the back door of D.F.'s apartment a few days later on July 26, 2017, as captured by the camera. Considering these circumstances, a rational trier of fact could find that defendant intended to commit another offense against D.F., using the same route, on July 26, 2017. See *Dorsey*, 2016 IL App (4th) 140734, ¶ 34.

¶ 34    Defendant contends that the "mere act" of turning the camera did not constitute a substantial step toward the commission of home invasion. However, the State established that defendant did much more than merely turn the camera around. Defendant, accompanied by a companion, passed through a locked door or closed window and up multiple flights of stairs in order to reach the landing outside D.F.'s apartment where the security camera was placed. This conduct meets section 5.01(2)(d) of the Model Penal Code, where defendant unlawfully entered the building "in which it is contemplated that the crime will be committed." See Model Penal Code § 5.01(2)(d), at 74-75 (1985).

¶ 35    Defendant's actions progressed well past preparation, as a factfinder could reasonably infer that he only abandoned his purpose after noticing and moving the camera; thus, but for the camera, defendant would have entered the apartment in order to injure D.F. a third time. See *Terrell*, 99 Ill. 2d at 433. As noted, defendant's abandonment of his criminal purpose is not a defense for attempted home invasion. See *Hawkins*, 311 Ill. App. 3d at 424.

¶ 36     It is a reasonable conclusion that defendant's proximity to the apartment, together with his actions earlier in the week, show that he intended to enter the apartment in order to injure D.F. on July 26, 2017. We find the inferences drawn by the factfinder to be supported by the evidence, and thus do not disturb them. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 37                                CONCLUSION

¶ 38     The evidence supporting defendant's conviction for attempted home invasion is not so unreasonable or improbable as to create a reasonable doubt of his guilt. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 39     Affirmed.