2025 IL App (1st) 242306-U

No. 1-24-2306B

THIRD DIVISION
March 12, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 24 CR 0451401 |
| | ) | |
| DEVIN DAVIS, | ) | Honorable |
| | ) | Carl Boyd, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the trial court's decision to detain defendant.

¶ 2     Defendant Devin Davis appeals the trial court's order denying his motion for relief pursuant to Illinois Supreme Court Rule 604(h)(2) (eff. April 15, 2024). Defendant contends that the State failed to show by clear and convincing evidence that (1) the proof is evident, or the presumption is great, that he committed the offense of first degree murder, (2) he posed a real and

present threat to the safety of any person or the community where he had no history of violent behavior and witnesses vouched for his good character, and (3) no condition or combination of conditions could mitigate his threat to the community. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was charged with first degree murder in connection with the shooting death of Eric Satterwhite. The State filed a petition to detain defendant pending trial pursuant to section 110-6.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-6.1 (West 2022)).[1] A public safety assessment prepared by pretrial services found that defendant scored a 2 out of 6 on the "new criminal activity" scale, and a 1 out of 6 on the "failure to appear" scale. The report recommended release with pretrial supervision "Level 3."

¶ 5      A hearing on the State's petition was conducted on April 12, 2024. The State's proffer indicated that on March 16, 2024, at approximately 6 p.m., Satterwhite was driving a blue Infiniti northbound on Interstate 394. He was the only occupant of the vehicle. Prior to the shooting, the license plate reader on Glenwood Dyer Road in Lynwood, Illinois, near the entrance to the Interstate 394 northbound ramp, captured Satterwhite's vehicle, as well as a black Ford Fusion, on the highway. The driver of the Fusion was 17-year old defendant, who was believed to be the only occupant of the vehicle.

¶ 6      Two witnesses in another vehicle driving northbound on Interstate 394 observed the Infiniti and the Fusion engage in "road rage" behavior. During this time, the witnesses "observed the driver of the black Ford point a handgun outside the window and discharge the gun multiple times in the

---

[1] Public Act 101-652 (eff. Jan. 1, 2023), which amended article 110 of the Code, is commonly known as the Pretrial Fairness Act or the SAFE-T Act. Neither name, however, is the official title of the legislation. See *Rowe v. Raoul*, 2023 IL 129248, ¶ 4.

direction of the passenger side of the blue Infinity [*sic*]." Satterwhite was shot in the torso with the bullet hitting an artery. The Infiniti continued for about half a mile before it struck another vehicle. Satterwhite was transported to the hospital where he was declared deceased.

¶ 7 Illinois State Police officers recovered spent .40 caliber shell casings from the road near the area of the shooting, and two projectiles from Satterwhite's vehicle. They also discovered the registration address of the Fusion, which was registered to defendant's mother.

¶ 8 Officers set up surveillance at his mother's house and observed defendant arriving alone in the Fusion at approximately 11 p.m., five hours after the shooting. After obtaining a search warrant, officers recovered three firearms. One weapon was found in defendant's mother's room and two were found in defendant's bedroom. Analysis of this evidence revealed that all of the recovered .40 caliber casings, as well as the two projectiles, were fired from the Glock handgun found in defendant's room.

¶ 9 Cell phone data showed that defendant was at his residence at 5:38 p.m. on March 16, 2024, and a Ring video camera also captured defendant leaving the residence at this time. Just before the shooting, at 6:02 p.m., defendant's phone was near Glenwood Dyer Road when the Fusion was captured by the license plate reader at that location. At the time of the shooting, defendant's phone was in the area of northbound 394 near Interstate 80 east and Interstate 294 west. At 11:06 p.m., defendant's phone was at his residence and the Ring camera captured defendant entering his house at this time. A jacket was recovered from defendant's room which he was wearing in the video.

¶ 10 Photographs from defendant's cell phone depicted him in possession of the Glock handgun found in his room. There was also a screenshot taken of a news article on the shooting. Defendant's

last internet search was "should I clean my Glock after I shot it." He was taken into custody on April 11, 2024.

¶ 11    After presenting its proffer, the State argued that the presumption was great that defendant committed the offense. Although no eyewitnesses identified defendant as the shooter, evidence from defendant's cell phone, the Ring camera video, the statements of the two witnesses, and the Glock handgun recovered from defendant's room established that "the proof is evident and the presumption is great that this defendant is in fact the individual" who shot Satterwhite.

¶ 12    The State also argued that defendant posed a real and present threat to the safety of any person or persons in the community in that he demonstrated "a complete and utter disregard for the safety of civilians." The State alleged that defendant possessed and discharged a firearm from a vehicle while driving on a highway at 6:00 p.m. The State further argued that defendant was "unpredictable" and there was no condition or combination of conditions that could mitigate the risk he posed to others. The State argued that electronic home monitoring would allow defendant "two days of unfettered movement throughout the county" and "GPS would do nothing" to protect the community.

¶ 13    The probation officer testified that, given defendant's new criminal activity and failure to appear scores, he could not recommend detention. Level 3 supervision was the maximum condition he could recommend. Such supervision would involve defendant reporting twice in person and twice over the phone every month. The officer stated that in rating defendant, he considered defendant's age and his background.

¶ 14    Defendant's counsel also offered evidence at the hearing. He stated that defendant turned 18 years old in March and was active in the community. He participated in sports and would graduate from high school in May of 2024. Defendant was a member of the chess club at school.

Defendant worked at Portillo's and would sometimes contribute to household bills. He lives with his parents and assists with the care of his older brother who has autism. Defendant possessed a FOID card, and his mother had a FOID card as well as a conceal and carry license.

¶ 15    Counsel argued that the two eyewitnesses could not give police a description of the shooter, nor could they identify anyone as the shooter. He argued that "[w]e don't know if somebody else came home prior to [defendant] with the vehicle." Defendant may have "left after the fact with the vehicle." Counsel also argued that defendant could have left his cell phone in the vehicle without being in the vehicle, which would explain the phone tracking data.

¶ 16    Regarding conditions of release, defense counsel argued that "24-hour confinement on electronic monitoring would be more than enough to ensure the safety of the community." Defendant had "no punishable background" and, given his young age, he was not a flight risk. If released on electronic monitoring, he would be in the care of his parents at home. They intended to ensure that defendant attend every court date and abide by the conditions of release.

¶ 17    Before ruling, the trial court stated that it heard the parties' arguments and considered the recommendations from pretrial services. It also "heard the argument against detention as well as the mitigation presented by" defense counsel. The court acknowledged its "obligation to take that evidence and determine whether or not each one of the prongs for detention has been satisfied."

¶ 18    First, the court found that the proof is evident or the presumption great that defendant committed an eligible offense. Although no eyewitnesses identified defendant as the shooter, the State presented "strong circumstantial evidence" that showed defendant committed the offense of first degree murder.

¶ 19    Second, the court found the State proved by clear and convincing evidence that defendant "poses a real and present threat to the safety of any person or persons or the community based on

the specific articulable facts of this case." Defendant shot the victim while both were driving on a public highway. As such, he poses a real and present threat "to the community who chooses to drive on the expressway." The court considered that defendant was 17 years old when he committed the offense, and that he has "no history." However, the court found that defendant "started out" with "the most serious crime of violence."

¶ 20    Lastly, the trial court considered whether any condition or combination of conditions "could mitigate the real and present threat" defendant poses to the community. The court addressed electronic monitoring, which it found was an appropriate condition "when there is a specific identifiable person or persons." However, that person "is the victim who is dead." The court continued:

"In addition, even if I could give electronic monitoring[,] that allows movement, unmonitored movement, by statute for two days. While I could order 24 hours [which] is what electronic monitoring is, the statute provides movement for essential matters two days a week.

In regards to GPS, I cannot assign GPS to stay away from the community. I cannot assign GPS to stay away from the expressway. Again, the victim in this case who GPS were [*sic*] to protect is deceased.

Pretrial services recommends level 3 monitoring. They cannot recommend detention. That's not within their purview. They stated that level 3 monitors two [days] in person and two over the phone. That's four days out of the month. No monitoring for the remaining periods of time. That lack of supervision monitoring or protection cannot in any way mitigate the real and present threat that was placed by this defendant to this victim on March 16, 2004 [*sic*] at 6:00 pm on the expressway when he chose to *** point the firearm

out of the car as observed by Witness 1 and 2 and fire in the direction of the victim killing him all over what is alleged to be road rage. Road rage is an unpredictable response that could occur at any time. It is this Court's opinion that the only condition that could protect and mitigate the real and present threat that this defendant [poses], based on his actions that are alleged to have occurred on this date, is to keep him detained."

¶ 21     On July 29, 2024, defendant, who was represented by new counsel, filed a motion for relief from pretrial detention pursuant to Supreme Court Rule 604(h)(2) (eff. April 15, 2024). In his motion, defendant alleged that the State failed to prove by clear and convincing evidence each of the statutory factors required for detention. He argued that the proof was not evident nor the presumption great that he committed first degree murder where the eyewitnesses only observed "the driver of the Ford Fusion extend a hand from the driver's door window and discharge a firearm in the direction of the passenger side of the blue Infiniti." Neither witness could identify the driver of either vehicle. Defendant contended that "evidence at trial will show that the Glock was fired not by [him] but by one of two passengers in the vehicle." The evidence will further show that the shooting was in self-defense or constituted second degree murder.

¶ 22     Regarding the second prong, there was no clear and convincing evidence that defendant posed a real and present danger to the safety of any person or the community. Defendant argued that he did not have a history of violent behavior and at the time of his arrest, he was not on probation. Defendant attached "character letters" to his motion that vouched for his good character.

¶ 23     As to the third prong, defendant argued that he "is not required to show that any proposed pretrial conditions would absolutely prevent any threat but only that such conditions would 'mitigate' such a threat." He argued that "home confinement, electronic monitoring, and residence

with his mother, who will guarantee to act as his custodian," would be sufficient to mitigate any threat he might pose to the community.

¶ 24    The trial court held a hearing on defendant's motion for relief. Defendant's mother, his father, his aunt and his grandfather testified at the hearing.

¶ 25    Desma Davis testified that she is defendant's mother and is employed at Walgreens as a pharmacy technician. She is married and also has a stepson who is autistic. Her family resides in a single family home and if defendant were to be released, he would also reside there. Although she is a FOID card holder, Ms. Davis assured the court that if defendant were released to her care, she would not have any firearms in her home. She would supervise defendant "and not let him violate any of the conditions without notifying the Court immediately," including any prohibition against the use of a computer or a cell phone. If defendant were released, he could work at a bowling alley where she and her husband also work part-time. He would be supervised there as well. Ms. Davis testified that defendant has recently associated himself with people whom she believed were bad influences.

¶ 26    Ms. Davis testified that defendant was a skillful bowler, that "he loves to laugh, loves a lot of adventure." He also has a close relationship with his autistic brother. Defendant assists his brother in making meals and accompanying him outdoors since his brother is not allowed to "go outside alone."

¶ 27    On cross-examination, Ms. Davis stated that she works less than 30 hours a week at Walgreens and works Sunday and Monday at the bowling alley. She acknowledged that she would not be at home while she worked. Ms. Davis stated that her husband works full-time as an environmental contractor and would not be home when he worked.

¶ 28    Ms. Davis testified that in March of 2024, when four firearms were recovered from her home, she had no knowledge of the firearms, ammunition or magazines recovered from defendant's bedroom. She also was not aware that defendant had photographs of himself with the firearms on his phone. She acknowledged that she sponsored defendant so he could obtain a FOID card when he was 13 years old. When completing his application, she understood that he was not allowed to possess a handgun. Ms. Davis acknowledged that when she submitted a change of address application regarding defendant's FOID card in May of 2022, she knew he had been arrested in 2021. In September 2022, defendant was arrested for battery and mob action. Defendant was released to his mother and then enrolled in an "alternative school" due to the "situation regarding the fight." Ms. Davis stated that she was the registered owner of the Ford Fusion, and that defendant was the primary driver of that vehicle.

¶ 29    Paul Coe testified that he is defendant's father. He is employed at Bluestone Environmental, which removes asbestos, lead, mold and biohazard material. He lives with his wife, Ms. Davis, and his son Joshua, who is noncommunicative. Defendant lived with the family before he was arrested. Mr. Coe stated that if defendant were released to his home with electronic monitoring or GPS curfew, he would supervise him. Defendant would not have access to a cell phone or a computer. He assured the court that defendant "is going to be back on track of doing things the right way. If he's able to come home, he will have no problem coming back and forth until this situation is resolved."

¶ 30    On cross-examination, Mr. Coe stated that he works full-time, five or six days a week. He stated that in March of 2024, he was not aware that defendant had firearms in the home or that he had pictures of himself with firearms on his phone.

¶ 31    Tracy Davis testified that she was defendant's aunt, and she worked at Northeastern University in Boston, Massachusetts as an operations manager. She has known defendant since he was born. Although she lives in a different city, she visits defendant and his family every summer and for holidays. She would not be present with defendant if he were released, but she would be in communication with him. She testified that defendant "will do anything for you."

¶ 32    Roosevelt Beckom testified that he is defendant's grandfather. He would see defendant "pretty often," but since defendant's family moved he sees them less often. Mr. Beckom stated that defendant is "a nice young kid. I never know [*sic*] him to be a troublemaker or anything like that. He's always mindful."

¶ 33    At the hearing, defense counsel argued that eyewitnesses could not identify the shooter. He argued that it was unlikely the driver of a car, with his "hand on the steering wheel, takes [his] other hand points a gun out the window and *** shoots." Counsel argued that instead, "[i]t's more logical to assume somebody in the back seat pointed a gun through the driver's side window and that that person was the shooter, not the driver." Counsel conceded that defendant was the driver of the Fusion at the time.

¶ 34    Counsel argued that "to mitigate" does not mean to "absolutely prevent" something from occurring. Rather, mitigation means to make an occurrence "less likely" to happen. Counsel argued that "with [defendant] being under the control of his parents who have now been alerted to the problems with him and will be vigilant to make sure they don't reoccur[,] there is every reason to believe there will be no further incident." Counsel urged the court to grant defendant release with conditions.

¶ 35    In response, the State recited the facts in its proffer at the initial hearing as clear and convincing evidence that defendant committed the offense and posed a danger to community. The

State argued that gunshot residue was found on defendant's jacket and on the driver's side window of the Fusion.

¶ 36    As for whether any conditions of release could mitigate defendant's threat, the State acknowledged that his family cared for him. However, defendant's family also applied for a FOID card for defendant when he was 13 years old when they knew he was "getting into trouble." They were unaware of the firearms and ammunition he kept in his bedroom. The State further argued that both parents "have other obligations. They have another son who needs their assistance. They both have jobs that take them away from the home and take their attention away from what's going on within the home." The State argued that no conditions could mitigate the risk defendant posed.

¶ 37    Defense counsel responded that "this was a one-time incident" and that a firearm was also found in the Infiniti. Counsel disagreed with the State's position that no conditions would mitigate defendant's risk to the community. He reiterated that defendant would be strictly monitored by his parents. Counsel argued that "GPS, home confinement and electronic monitoring *** exist because they do mitigate the danger."

¶ 38    The trial court found that the State proved, by clear and convincing evidence, that defendant committed the eligible offense of first degree murder. The court also found that defendant posed "a real and present threat to the safety of people or persons in the community based on the fact that he at age 17 is armed with a handgun, a Glock 40, did shoot at a vehicle driven by a complete stranger and shot at the vehicle not once but several times striking the vehicle" and killing the driver.

¶ 39    The court then considered whether any combination of conditions could "mitigate the threat" he posed. It considered "the testimony of the defendant['s] mother Desma Davis. The Court also [took] into account the testimony of his father Paul Coe," and it heard testimony from

defendant's aunt and his grandfather. The trial court acknowledged defendant's proposal that he be released "on electronic home monitoring and possibly coupled with GPS and curfew."

¶ 40    The court noted that defendant resided with his parents at the time of the offense, and under electronic home monitoring he would be released "back to their custody." The court was "keenly aware that while placed on electronic home monitoring the defendant would be allowed at least two days of unfettered movement." As such, the court did not believe that "GPS, electronic home monitoring or even a curfew could prevent this defendant from finding or possessing another firearm and getting into another incident ***." The court reiterated that "this was a road rage incident and I do not believe that GPS or EHM can prevent this defendant from finding a way to arm himself again and using that weapon for reasons unknown to this Court." The trial court ordered that defendant remain detained.

¶ 41    Defendant filed this appeal.

¶ 42                                    II. ANALYSIS

¶ 43    Before considering the merits of defendant's appeal, we first address the proper procedure regarding a hearing on a Rule 604(h) motion for relief. At defendant's hearing, the trial court heard testimony from defendant's family members that was not presented at the initial detention hearing. This court, however, has determined that the plain language of Rule 604(h) does not provide for the presentation of new evidence, and that "[a] second full-scale pretrial detention hearing upon a motion for relief, with new evidence and proffers, would only complicate the appeals process and add confusion regarding the issues before this court on appeal." *People v. Williams*, 2024 IL App (1st) 241013, ¶ 28. While the trial court may hear new evidence when considering whether continued detention is necessary under section 110-6.1(i-5) of the Code (see *People v. Harris*, 2024 IL App (2d) 240070, ¶ 51), a proper hearing under Rule 604(h) consists only of an

examination of the State's evidence at the initial detention hearing and a determination of whether the State had met its burden of proof. *Williams*, 2024 IL App (1st) 241013, ¶ 29. Although the hearing on defendant's motion for relief was an improper full detention hearing, this error was harmless because our determination remains the same even if we consider the testimony presented at the second hearing. *Id.*

¶ 44    Section 110-6.1(e) of the Code provides that "[a]ll defendants shall be presumed eligible for pretrial release." 725 ILCS 5/110-6.1(e) (West 2022). In order to detain a defendant, the State must show, by clear and convincing evidence, that (1) the proof is evident or the presumption great that the defendant has committed a detainable offense, (2) the defendant poses a real and present threat to the safety of any person or the community based on the specific facts of the case, and (3) no conditions or combination of conditions exist that can mitigate this threat or defendant's willful flight. *Id.* Since no live testimony was presented at the initial detention hearing, we review the trial court's fact findings, as well as the court's decision to detain defendant, *de novo*. *People v. Morgan*, 2025 IL 130626, ¶¶ 54-55.

¶ 45    Defendant first contends that the State failed to establish, by clear and convincing evidence, that he was the shooter. The State's proffer showed that defendant, while driving a black Ford Fusion on Interstate 394 northbound, was involved in a road rage incident with a blue Infiniti. Witnesses "observed the driver of the black Ford point a handgun outside the window and discharge the gun multiple times in the direction of the passenger side" of the Infiniti. The driver of the Infiniti died as a result of a gunshot wound to his torso. Police officers recovered a Glock handgun from defendant's bedroom, and testing revealed that the .40 caliber shell casings recovered from the crime scene were fired from the Glock handgun. Gunshot reside was also

detected on defendant's jacket. Data from defendant's cell phone placed him in the Fusion at the time and location of the shooting.

¶ 46    Although no witness identified defendant as the shooter, strong circumstantial evidence supports that conclusion. Circumstantial evidence is admissible in criminal cases if it is relevant and more probative than prejudicial. See *People v. Levy*, 204 Ill. App. 3d 201, 205 (1990). In fact, a criminal conviction may be based solely on circumstantial evidence. *People v. Brown*, 2013 IL 114196, ¶ 49. We are also mindful that the State's burden here is not proof beyond a reasonable doubt. *People v. Stock*, 2023 IL App (1st) 231753, ¶ 13. As such, a strong circumstantial proffer of what the evidence will show can certainly support the trial court's determination that the proof is evident, or the presumption is great, that defendant was the shooter in this case. We find that the State established this element by clear and convincing evidence.

¶ 47    Next, defendant contends that the State failed to establish that he posed a real and present threat to the safety of any person or persons or the community. To assess this element, the legislature provided a list of factors that, while not comprehensive, guide courts in determining whether a defendant poses a real and present threat. 725 ILCS 5/110-6.1(g) (West 2022). These factors include:

"(1) The nature and circumstances of any offense charged, including whether the offense is a crime of violence, involving a weapon, or a sex offense.

(2) The history and characteristics of the defendant including:

(A) Any evidence of the defendant's prior criminal history indicative of violent, abusive or assaultive behavior, or lack of such behavior. ***

(B) Any evidence of the defendant's psychological, psychiatric or other similar social history which tends to indicate a violent, abusive, or assaultive nature, or lack of any such history.

(3) The identity of any person or persons to whose safety the defendant is believed to pose a threat, and the nature of the threat.

(4) Any statements made by, or attributed to the defendant, together with the circumstances surrounding them.

(5) The age and physical condition of the defendant.

(6) The age and physical condition of any victim or complaining witness.

(7) Whether the defendant is known to possess or have access to any weapon or weapons.

(8) Whether, at the time of the current offense *** the defendant was on probation, parole *** or other release from custody pending trial ***.

(9) Any other factors, including those listed in Section 110-5 of the Article deemed by the court to have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior." 725 ILCS 5/110-6.1(g) (West 2022).

¶ 48    Defendant argues that the trial court ignored his lack of prior history of violent behavior and the fact that he was not on parole at the time of his arrest. Defendant also lacked any psychological or psychiatric history indicating violent, abusive or assaultive behavior. Citing *People v. Shaffer*, 2024 IL App (2d) 240085-U, defendant argues that the trial court's finding on this element should be reversed because the court failed to consider factors that would have made its determination "individualized," as required by the statute.

¶ 49    In *Shaffer*, law enforcement seized the defendant's cell phone pursuant to a search warrant. *Id*. ¶ 6. The warrant was based on a Verizon " 'Cybertip' " that the defendant was uploading suspected child pornography to their cloud storage. *Id*. The State charged defendant with three counts of child pornography and filed a petition to detain the defendant under section 110-6.1 of the Code. At the detention hearing, the State's proffer showed that the defendant told an investigator that he downloaded and saved files to his cell phone or would take a screen shot of images from web pages. *Id*. He admitted that he "masturbated to" the images. *Id*. The State closed by stating that "we do anticipate there will be more, many more files." *Id*. A pretrial report assessed the defendant as a "Low Risk" to not appear at future court appointments or to reoffend. *Id*. ¶ 7.

¶ 50    Regarding the danger element, the State simply argued that the defendant was a danger to the community because if released, he would again possess child pornography. *Id*. ¶ 11. The defendant was a danger to the community because "if convicted, he would have to report as a sex offender." *Id*. ¶ 10.

¶ 51    The appellate court found that, regarding the danger element, the State "relied solely upon the first section 110-6.1(g) factor—the nature and circumstances of the charged offense." *Id*. ¶ 23. It noted that the State's proffer cited few specific or articulable facts to support its reasoning and lacked details such as how often the defendant accessed the images and whether he shared the images. Rather, the State speculated that the evidence would show " 'what will most likely end up being multiple pictures of what will be child pornography on various devices.' " *Id*. The trial court's order merely adopted the State's argument and focused on the "nature of the allegations" in its dangerousness analysis. ¶ 24.

¶ 52    The appellate court found that the trial court's determination on this element ignored the other statutory factors "that would have made [its] decision to detain defendant individualized,"

such as his characteristics, his criminal history, his tendency towards violence or abusive behavior, or his age and physical condition. *Id.* ¶ 25. It held that the trial court's "narrow focus on the nature of the charged offense" when determining the defendant's dangerousness failed to comply with the Code's requirements. *Id.*

¶ 53    *Shaffer* is distinguishable. Here, the trial court considered more than just the nature of defendant's offense. It also considered evidence presented by the State. The evidence showed that although he had no history of violent conduct, 17-year-old defendant "started out" with "the most serious crime of violence" by shooting the victim during a road rage incident while both were driving on a public highway. Defendant used a Glock handgun even though he was not allowed to possess such a firearm by law. Taking these factors into account, the court determined that defendant posed a real and present threat "to the community who chooses to drive on the expressway." We agree with the trial court's finding that the State met its burden on this element.

¶ 54    Finally, defendant contends that the trial court erred when it found that no conditions could mitigate his threat to the community based on the specific facts of the case. On this factor, the State bears the burden of establishing, by clear and convincing evidence, that "no condition or combination of conditions *** can mitigate (i) the real and present threat to the safety of any person or persons or the community, *** or (ii) the defendant's willful flight ***." 725 ILCS 5/110-6.1(e)(3) (West 2022). Defendant argues, however, that the trial court improperly considered whether any condition could *prevent* him from committing another offense, when it should have considered whether any condition could *mitigate* that risk. As support, he cites *People v. Reamy*, 2024 IL App (2d) 240084-U.

¶ 55    In *Reamy*, the defendant was charged with possessing and disseminating child pornography. *Reamy*, 2024 IL App (2d) 240084-U, ¶ 4. The defendant admitted that he possessed

the discovered videos and photographs and transmitted two videos to others. *Id*. At the defendant's pretrial detention hearing, his counsel emphasized the fact that the defendant was 50 years old and had no history of violent or assaultive behavior. *Id*. ¶ 7. Counsel also argued that there were no identifiable victims. *Id*. The defendant proposed that if released, he would surrender all items that allowed him access to the internet, including cell phones. He also suggested that electronic monitoring could verify his compliance with this directive. *Id*. ¶ 8. The trial court ordered the defendant released on electronic home monitoring. *Id*. ¶ 9. He was further prohibited from having unsupervised contact with underage minors, accessing the internet, and possessing any devices that allow internet access. *Id*. ¶ 9.

¶ 56    The State appealed. Relevant here, the State argued that, given the "inherent danger" of the defendant's charges, no conditions of release could protect the community. *Id*. ¶ 20. The State contended that even with the conditions imposed by the trial court, it was "theoretically possible" for the defendant to engage in harmful conduct. *Id*. ¶ 18.

¶ 57    The appellate court disagreed with the State's argument that a criminal defendant charged with child pornography should "*per se* be denied pretrial release," as it was contrary to legislative intent. (Emphasis in the original.) *Id*. ¶ 23. According to the statute, the relevant issue "is whether the conditions would *mitigate*—not completely prevent—any real risk" posed by the defendant. (Emphasis in the original) *Id*. ¶ 19. The court found that "the conduct underlying [the] defendant's charged offenses was inextricably bound to his use of the internet." *Id*. ¶ 17. Therefore, "it is axiomatic that prohibiting defendant from using or accessing the Internet would mitigate any harm stemming from these types of conduct." *Id*. It affirmed the trial court's decision. *Id*. ¶ 23.

¶ 58    *Reamy* is inapposite. The State in this case did not argue that every person charged with a road rage offense should "*per se* be denied release," with no consideration given as to whether any

threat posed by that person could be mitigated. See *Reamy*, 2024 IL App (2d) 240084-U, ¶ 23. The record shows that the trial court explicitly understood that it must determine whether any condition or combination of conditions "can *mitigate* the threat that this defendant poses to the persons in the community." (Emphasis added.) In any event, we are reviewing this contention *de novo*. "Under a *de novo* standard, the reviewing court owes no deference to the trial court's judgment or reasoning." *People v. Begay*, 2018 IL App (1st) 150446, ¶ 34.

¶ 59 We now address defendant's contention that the State failed to prove, by clear and convincing evidence, that no condition or combination of conditions could mitigate his threat to the community. He cites *People v. Atterberry*, 2023 IL App (4th) 231028, and *People v. White*, 2024 IL App (1st) 232245, as support.

¶ 60 In *Atterberry*, the defendant was charged with the offense of traveling to meet a child. *Atterberry*, 2023 IL App (4th) 231028, ¶ 3. He used the internet to solicit a person he believed was a child in order to perform a sexual act. *Id*. The pretrial investigation report revealed that the defendant was 24 years old, had a technical degree, and worked full-time. He had no criminal history and scored a 0 out of 14 on a risk assessment scale. *Id*. ¶ 5. The trial court held a pretrial detention hearing pursuant to the State's petition. After presentation of the State's proffer and defense counsel's response, the trial court detained the defendant. The court reasoned:

"As I stated earlier, before the Pretrial Fairnesses [*sic*] Act, I would have given the Defendant a reasonable monetary bond that would have taken into consideration the factors that I have just enumerated here that raise concern about the Defendant having contact with any child under the age of 18 within this community; and I believe that that monetary bond would have taken into consideration his ability to pay. The Defendant may or may not have been able to post that. However, that would have served as a very strong deterrent for the

Defendant; and the risk of losing that bond money has historically proven to provide a good incentive for people to not continue to engage in criminal behavior.

And since I do not have that incentive because the legislature, governor and Illinois Supreme Court have taken that discretion away from me and because the Defendant meets the dangerousness standard by clear and convincing evidence, I am ordering that he be detained pending trial." *Id.* ¶ 7.

¶ 61 The appellate court vacated the trial court's order and remanded the matter for further proceedings. It found that the statute requires the trial court to conduct an individualized assessment of whether the defendant should be detained. *Id.* ¶ 15. The trial court, however, refused to consider the proper statutory criteria. *Id.* ¶ 16. Instead, the trial court "included in its ruling a lengthy and biased commentary about the wisdom of Illinois' recent bail reform." *Id.* Furthermore, the trial court "never articulated why there is reason to believe *this particular defendant* would not comply with any conditions of release." (Emphasis in the original.) *Id.* ¶ 19. The trial court simply believed that no conditions of release other than monetary bail could "mitigate the threat posed by *anyone* who is charged with the offenses at issue." (Emphasis in the original.) *Id.* Since the trial court "did not even attempt to apply the proper statutory criteria for detention under the new law," the cause was remanded for the trial court to "make express findings, based on defendant's individual circumstances, as to whether any condition or combination of conditions allow for defendant's pretrial release." *Id.* ¶ 22.

¶ 62 In *White*, the defendant was charged with reckless homicide, and the State filed a petition to detain him. *White*, 2024 IL App (1st) 232245, ¶ 3. At the hearing, the State alleged that the defendant drove toward a red light while traveling almost 91 miles an hour and struck the driver's side of another vehicle. *Id.* ¶ 4. The driver of the other vehicle died hours later. *Id.* ¶ 5. Two

passengers in the defendant's vehicle were seriously injured. *Id*. Officers recovered two open bottles of alcohol and plastic cups from the defendant's vehicle. A video also showed the defendant drinking from a plastic cup an hour before the incident. *Id*.

¶ 63    The defendant, however, denied drinking alcohol or driving at a high rate of speed. *Id*. ¶ 6. Defense counsel argued that a responding officer at the scene did not detect alcohol on the defendant's breath, nor did he perform a field sobriety test. *Id*. ¶ 7. Counsel also noted that the weather was "wet," and the road was "slippery." *Id*. Counsel argued that the defendant had low scores regarding his risk for "new criminal activity" and "failure to appear" in court. *Id*. ¶ 8.

¶ 64    Regarding the third statutory factor, the State argued only that "no conditions or combination of conditions can mitigate the risk that the defendant poses." *Id*. ¶ 10. Defense counsel responded that the State did not proffer facts indicating that alcohol was present in the driver's area of the defendant's vehicle. *Id*. ¶ 11.

¶ 65    In ruling that the defendant should be detained, the trial court considered the evidence presented by defense counsel. It found, however, that " 'because of the nature of this case[,] because I have a decedent and two severely injured people, the Court is unwilling to take the risk of any violations.' " *Id*. ¶ 13. In its written order, regarding whether any conditions could mitigate the defendant's threat, the trial court stated, "Due to lack of concern and judgment for the safety of others[,] this Court cannot risk the release of [defendant] at this time." *Id*. ¶ 14.

¶ 66    On appeal, the State argued that it must only allege that no combination of conditions could mitigate the defendant's threat. *Id*. ¶ 20. The appellate court disagreed, finding that the State "must prove this factor" and if it fails to do so, the defendant is presumed eligible for pretrial release under section 110-6.1(e). *Id*. ¶ 21. It found that the State "presented no evidence relevant to this

third factor ***." ¶ 25. In fact, the State never discussed this portion of the Code. *Id*. Since the State "effectively ignored the third factor," it did not meet its burden under the statute. *Id*. ¶ 26.

¶ 67    These cases are distinguishable. Unlike *White*, the State in this case provided specific, articulable facts in its proffer regarding why defendant should be detained. Also, the trial court below did not base its decision on a biased opinion about the wisdom of the bail reform provision, as did the court in *Attenberry*.

¶ 68    Instead, the record shows that the trial court considered the parties' arguments and the recommendations from pretrial services. The court acknowledged its "obligation to take that evidence and determine whether or not each one of the prongs for detention has been satisfied." As the court noted, defendant resided with his parents at the time of the offense, and under electronic home monitoring he would be released "back to their custody." The evidence showed that while living with his parents, defendant collected firearms and ammunition in his bedroom, including a Glock handgun. On the day of the incident, defendant had the loaded Glock handgun in the vehicle with him as he drove on a public highway. After engaging in a road rage incident with another driver, defendant used the handgun to fire at the other driver, killing him.

¶ 69    As the trial court found, "road rage" is "an unpredictable response that could occur at any time." Furthermore, defendant fired his weapon multiple times at another vehicle while driving on a public highway at 6 p.m., a time one expects people to be on the road. Not only did the act of shooting the firearm pose a danger to the public, but the vehicles driven by defendant and his victim could have caused serious harm to others on the highway during the incident. Defendant may not have had a violent history, but he "started out" with "the most serious crime of violence" when he killed Satterwhite. Given defendant's demonstrated affinity for firearms and ammunition, his willingness to flout the law regarding his possession of handguns, and the danger associated

with his impulsive conduct, we agree with the trial court's determination that no condition or combination of conditions could mitigate the real and present threat to the safety of the community posed by defendant. See *Morgan*, 2025 IL 130626, ¶ 54 (conducting *de novo* review of the evidence where the parties to a pretrial detention hearing proceeded solely by proffer).

¶ 70                                III. CONCLUSION

¶ 71    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 72    Affirmed.